Peggy S. TILLOTSON, and Raymond
H. Tillotson, Jr., Appellants,

v.

CLAY COUNTY DEPARTMENT OF
FAMILY AND CHILDREN,
Appellee.

No. 11A01–0205–JV–162.

Court of Appeals of Indiana.

Oct. 23, 2002.

Fritzy D. Modesitt, Brazil, IN, Attorney for Appellants.

Margaret A. Berry, Brazil, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

■ Peggy and Raymond Tillotson (Parents) appeal the involuntary termination of their parental rights with their five minor children, D.J.T., J.R.T., R.H.T., D.D.T., and S.M.T. They present the following restated issue for review: Were Parents denied due process of law by the trial court's failure to devise alternative means by which they could testify and participate in the termination hearing from prison?[1]

We affirm.

On August 4, 2000, fourteen-year-old D.J.T. was discovered shackled by his an-kles inside an approximately two-foot-by-three-foot closet. Parents had locked him in the small area, providing him with only bread and water, and then left for work. Their plan was to leave him locked up in this manner for forty-eight hours and then allow him short periods of time out of confinement for about another two weeks until school started. Following this discovery, Parents were charged with neglect of a dependent, a class C felony. They pleaded guilty on December 22, 2000 and were sentenced on February 6, 2001 to four years in prison.

Pursuant to a petition filed by the Clay County Office of Family and Children (the OFC), the children were adjudicated Children in Need of Services on December 22, and a dispositional order was entered on January 29, 2001, providing for the children to remain in foster care. Thereafter, on August 20, 2001, the OFC filed petitions for the involuntary termination of their parental rights.[2]

Parents filed a pro se Motion to Transport on September 6, 2001, seeking an order authorizing the Clay County Sheriff's Department to transport them from their respective places of incarceration to the Clay County Circuit Court for the termination hearing.[3] The trial court denied this motion. Parents, by appointed counsel, filed a second Motion to Transport on October 25, 2001. Peggy's motion, which is substantially similar to Raymond's, provides in relevant part:

> October 1996, Peggy pleaded guilty to battery causing bodily injury on a child, a class D felony agreed to be treated as a class A misdemeanor, for beating D.J.T. with a board. In December of that same year, Raymond pleaded guilty to battery, as a class B misdemeanor, for choking R.H.T.

---

1. Parents also assert that the denial violated their rights to due course of law and equal protection under the Indiana Constitution. Because Parents only mention these issues in passing and fail to present cogent argument, we find these issues waived. Ind. Appellate Rule 46(A)(8)(a); *Cruz Angeles v. State*, 751 N.E.2d 790 (Ind.Ct.App.2001), *trans. denied*.

2. Parents have a long history with the OFC, including several substantiated neglect and abuse charges. We specifically note that in

3. Raymond is incarcerated in the Correctional Industrial Facility in Pendleton, Indiana, and Peggy is incarcerated in the Rockville Correctional Facility in Rockville, Indiana.

Comes now the respondent, by counsel, and moves the court to transport respondent from her place of incarceration so that she may defend the termination of her parental rights. Further, and in the event that the court denies transportation, the respondent requests the court devise an alternate method by which respondent could give testimony and participate in the hearing.

*Appellants' Appendix* at 22. The trial court also denied this motion.

Four months later, on February 27, 2002, on the second day of the termination hearing and prior to the introduction of evidence, Parents, by counsel, again raised the issue of their absence from the hearing:

[COUNSEL]: Okay. Your Honor, we object to the fact that the Respondents in this matter are incarcerated, one in Pendleton. Mr. Tillotson is in Pendleton. Mrs. Tillotson is in the Woman's [sic] facility at Rockville. We object to their non-presence for the reason that they would provide me with valuable assistance during this trial as to conversations that's going to be testified regarding witness's [sic] conversations with the Respondents. They can—They would also testify in defense of certain of their actions, including actions that I believe will come into trial regarding past offenses and past acts of the Tillotsons. Also there have been various conversations with psychiatrists and psychologists, particularly Mr. Casserly, that the Tillotsons were given certain instructions and—and, ah, there were certain conversations had that would be defensive to the Tillotsons. Also, not the least, of course, that they would be able to sit up here on the witness stand and defend themselves and contradict many and much—many state-

ments that's [sic] going to be made and attributed to them or their children. We would further, for the record, state that we understand that it's in the sound discretion of the trial Court whether or not to transport the respondents. However, our motion was also for the Court to consider an alternate method for them to testify today. For the record, there was no hearing held regarding an alternate method to testify, for example, telephone conversations. We would also, for the record, state that—and we can provide an affidavit, at least from Pendleton, that it is routine for a prisoner to testify. They have a place set up for the prisoner to sit right at the table and be hooked directly to the trial court and testify from Pendleton.

COURT: I have no such technology. I don't understand. What's that?

[COUNSEL]: Pardon?

COURT: This Court has no such technology.

[COUNSEL]: It—It would just be a speaker phone, Your Honor. A simple speaker phone.

COURT: Oh, a speaker phone. I thought you meant something like the—

[COUNSEL]: No. It would be a simple speaker phone, which could be run right into the Courtroom where they could testify and hear—even hear the proceedings. And this is done routinely at Pendleton according to the Director.

COURT: Is it my understanding, [COUNSEL], that their release date is—Is it November?

[COUNSEL]: Release date now is—for both of them is in January.

COURT: January, 2003?

[COUNSEL]: Yeah. And Pendleton is an hour and—about an hour and a half from here; and, of course, Mrs. Tillotson is about thirty minutes from here.

COURT: [OFC COUNSEL?]

[OFC COUNSEL]: Your Honor, basically our understanding of the law is that it's in the sound discretion of the trial court, and we leave it up to the Court.

[COUNSEL]: To which we would respond, Your Honor. Discretion, I don't believe, was applied here appropriately, because there was no consideration given to alternate methods to testify.

COURT: The motion for transportation is denied. Please proceed.

*Transcript* at 32–35.

Parents were represented by appointed counsel at each stage of the termination proceedings. At the evidentiary hearing, Parents' counsel exercised their right to cross-examine the OFC witnesses but did not present any witnesses or evidence in their favor. Following the hearing, on March 6, 2002, the trial court entered an order terminating their parental rights. The trial court found the following facts, among others, established by clear and convincing evidence:

b. [The OFC] had a lengthy history of substantiated abuse and neglect charges against both parents, including two substantiated neglect charges and four substantiated abuse charges in a period from December, 1993, through August, 2000. Three of the incidents resulted in criminal charges being filed against the parents and convictions. . . .

That despite all the services, the parents maintained a chaotic and unpredictable home environment wherein the children were subjected to frequent, inappropriate and heinous discipline, including: severe beatings with boards, belts, a baseball bat, and other instruments, which beatings often left marks and other bruises; choking; cruel confinement; food restrictions; emotional abuse; and forced ingestion of harmful substances (hot sauce, baking soda, chewing tobacco). The children witnessed additional violence from the parents, towards each other, and the children were left with an inappropriate baby-sitter who physically abused them as well.

c. The children have all made significant progress and improvement in their respective foster homes after being removed from the care and custody of their parents. The children have been removed from their home since August, 2000. Their parents will not be released from their incarceration for another year. The parents show no signs of taking responsibility for past actions and have not shown significant improvement in their parenting ability despite extensive efforts of [the OFC] to provide services to improve parenting ability. The children have special needs and are in need of a stable, safe and caring environment which the parents are incapable of providing.

\* \* \* \*

*Appellants' Appendix* at 17–18. This appeal followed.

Parents' only contention on appeal is that their due process rights were violated when the trial court failed to devise an alternate method by which they could give testimony and defend themselves against the damning evidence presented by the OFC.[4] They contend, "due process and

4. Parents also appear to challenge the trial court's failure to hold a hearing on their sec-

fundamental fairness would demand the parents not be required to stand mute in the light of so many allegations." *Appellants' Brief* at 10.

■ When the State seeks to terminate a parent-child relationship, it must do so in a manner that meets the requirements of the due process clause. *J.T. v. Marion County Office of Family & Children,* 740 N.E.2d 1261 (Ind.Ct.App.2000) (citing *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)), *trans. denied.* While an incarcerated parent does not have an absolute right to be physically present at a termination hearing,[5] such parent does have the right to be heard at a meaningful time and in a meaningful manner. *See J.T. v. Marion County Office of Family & Children,* 740 N.E.2d 1261. Although due process has never been precisely defined, the phrase embodies a requirement of fundamental fairness. *Id.* The nature of the process due in parental rights termination proceedings turns on a balancing of three factors: (1) the private interests affected by the proceedings; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

We have previously explained the substantial private interests in termination cases as follows:

Specifically, the action involves a parent's interest in the care, custody, and control of his children, "perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court. This court has stated that the parent-child relationship is "one of the most valued relationships in our culture." Accordingly, a parent's interest in the accuracy and justice of the decision is "a commanding one."

*J.T. v. Marion County Office of Family & Children,* 740 N.E.2d at 1264 (citations and footnote omitted).

The government also has a strong countervailing interest in protecting the welfare of the children involved. "Although the State does not gain when it separates children from the custody of fit parents, the State has a 'compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment are at issue.'" *Id.* (quoting *E.P. v. Marion County Office of Family & Children,* 653 N.E.2d 1026, 1032 (Ind.Ct.App. 1995)). We have further recognized that "[d]elays in the adjudication of a case impose significant costs upon the functions of government as well an intangible cost to the lives of the children involved." *J.T. v. Marion County Office of Family & Children,* 740 N.E.2d at 1264.

As noted previously, Parents did not request a hearing in either of their motions to transport. Furthermore, in their second motion to transport, Parents failed to specify any type of alternative means available to the trial court. It was not until the second day of the termination hearing, four months after the second motion, that Parents cited as an example the option of testifying from prison over a speaker phone. At that point, no arrange-

ond motion to transport. We note that Parents never requested a hearing on their motion. They further fail to cite to any authority in their appellate brief that would require the trial court to hold a hearing on such a motion.

5. "In general, the decision whether to permit an incarcerated person to attend such a hearing rests within the sound discretion of the trial court." *J.T. v. Marion County Office of Family & Children,* 740 N.E.2d at 1265.

ments had been made with the prisons or the court for such an alternative method. This eleventh-hour request clearly would have resulted in delay. There would also have been at least moderate fiscal and administrative burdens associated with such an alternative method.

We finally consider the risk of error created by not allowing Parents to participate through alternative means. Here, Parents were represented by counsel throughout these proceedings and were provided with the opportunity to cross-examine witnesses and present evidence through their counsel. Under these circumstances, we have recognized, "the risk of an inaccurate result decreases significantly." *Id.* We also observe that Parents, as unavailable witnesses, could have deposed themselves and entered their depositions into evidence at the hearing. *See* Ind. Evidence Rule 804(b)(1). They chose not to exercise this option. We recognize that introduction of a prior deposition is not the equivalent of allowing a parent to testify at trial and refute specific evidence presented by the State. We find it noteworthy, however, that Parents chose not to present any evidence or statements on their own behalf, despite the fact that they were well aware of at least the majority of allegations that would have been brought against them. Moreover, in light of the extreme and well-documented abuse in this case, we are at a loss as to how Parents could have justified their actions. Both parents are currently in jail for criminal neglect of a dependent,[6] a serious charge

that they chose not to defend against and to which they pleaded guilty and agreed to a four-year prison sentence. This conviction is directly related to the termination action and amounts to per se evidence of neglect. Under the specific circumstances of this case, we find that any risk of an erroneous termination of parental rights given the procedures utilized at trial was insignificant.

■ In balancing the *Mathews* factors, we conclude that under the narrow facts of this case, the trial court's failure to implement alternative means for Parents to testify at the termination hearing did not deny them due process of law. We caution, however, that in future cases, trial courts would be well advised to fully consider alternative procedures by which an incarcerated parent could meaningfully participate in the termination hearing when the parent cannot be physically present.[7]

Judgment affirmed.

NAJAM, J., and SHARPNACK, J., concur.

---

**6.** Parents also each have a conviction, pursuant to guilty pleas, for battering one of their children on separate occasions.

**7.** Such alternative procedures may include, among other things, using a speaker phone at the hearing or continuing the hearing after the State has presented its case and allowing the parent time to review a transcript or audio tape of the hearing and then respond to

allegations raised by the State's witnesses. *See In re Adoption No. 6Z98001,* 131 Md.App. 187, 748 A.2d 1020 (2000) (reviewing cases utilizing alternative procedures); *State ex rel. Children, Youth & Families Dep't v. Ruth Anne E.,* 126 N.M. 670, 974 P.2d 164 (Ct.App. 1999) (reviewing cases utilizing alternative procedures).