**In the Matter of the Involuntary Termination of Parent–Child Relationship of B.J., C.W., and S.W.**

**Karma W. and Brandon J., Appellants–Defendants,**

v.

**Marion County Department of Child Services, Appellee,**

**Child Advocates, Inc., Guardian ad Litem.**

No. 49A04–0706–JV–313.

Court of Appeals of Indiana.

Jan. 14, 2008.

Transfer Denied March 24, 2008.

product or is privileged in nature with respect to the pending federal litigation.

Anna E. Onaitis, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant, Karma W.

Barry A. Chambers, Marion County Department of Child Services, Indianapolis, IN, Attorneys for Appellee.

Amy Karozos, Indianapolis, IN, Attorney for Appellant, Brandon J.

## OPINION

MATHIAS, Judge.

Karma W. ("Mother") and Brandon J. ("Father") appeal the involuntary termination of their parental rights to their respective children in Marion Superior Court. We affirm.

### Issues

Mother and Father raise several issues on appeal, which we consolidate and restate as:

I. Whether the Marion County Department of Child Services ("MCDCS") failed to provide Father with proper notice of the termination hearing in violation of Indiana Code section 31–35–2–6.5;

II. Whether the trial court abused its discretion in denying Father's counsel's motion to continue thereby depriving Father of his constitutional right to due process; and,

III. Whether the trial court's termination order was clearly erroneous.

### Facts and Procedural History

Mother is the biological mother of her daughters C.W., S.W., and B.J. B.J. was born on January 24, 2006. B.J. tested positive for cocaine at birth. On February 7, 2006, the MCDCS filed a petition alleging B.J. and her two sisters were children in need of services ("CHINS"). The CHINS petition alleged that "the childrens' physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of a parent . . . and the children need care, treatment, or rehabilitation that [they] are not receiving and are unlikely to be provided . . . without the coercive intervention of the Court." Ex. Vol.1–Father, p. 3.[1] The CHINS petition further indicated that Mother, who was the sole legal custodian of all three children, used cocaine, had

---

1. Father and Mother submitted separate briefs, exhibits, and other materials on appeal. We designate each accordingly.

tested positive for THC during her pregnancy, and had admitted to using marijuana during her pregnancy. The CHINS petition also stated that Father had not established paternity for B.J. "nor shown an ability or willingness to appropriately parent the children at any time." *Id.*[2]

On the same day the CHINS petition was filed, both Father and Mother admitted to the allegations of the CHINS petition and the children were made wards of the MCDCS. The cause was thereafter continued, Father was ordered to submit to DNA testing and a Dispositional Hearing was scheduled for March 3, 2006.

On March 3, 2006, the trial court entered its disposition order removing the children from Father's and Mother's care. The court also entered a participation decree wherein Father and Mother were ordered to complete certain services including parenting assessments and classes, drug and alcohol assessments, substance abuse treatment and home-based counseling. Both parents were also ordered to refrain from the use of non-prescription drugs and to submit to random drug screens, and Father was ordered to submit to paternity testing.

On January 3, 2007, the MCDCS filed a petition for involuntary termination of Father's and Mother's parental rights to their respective children. The termination hearing was held on May 17, 2007. Father did not appear, but was represented by counsel. On May 21, 2007, the trial court entered an order terminating Father's and Mother's parental rights. In so doing, the trial court made the following pertinent specific findings:

**FINDINGS OF FACT**

\* \* \*

5. Mother and Father were to complete services and recommendations prior to reunification. Services included a parenting assessment with follow-up recommendations and intensive outpatient treatment. Mother and Father were to maintain weekly contact with their family case manager and visit the children.

6. Mother completed her assessment and successfully completed her parenting classes. She has maintained employment through a temporary agency for at least six months. Mother lives in a three[-]bedroom home with her mother and brother.

7. Visitation between Mother and the children was consistent until the Court suspended it on August 8, 2006 for missed visits. It was reinstated over four months later and Mother has only missed once since that time.

8. Mental health treatment for depression was recommended and the family case manager relayed this to Mother, with provider information, in July of 2006. The family case manager also included reminders to Mother in letters sent during the months of January and February, 2007.

8.[sic] Mother has failed to receive mental health counseling/treatment.

9. An intensive outpatient treatment referral was made to Community Addictions Services of Indiana, Inc. "CASI" ... in March of 2006. Although Mother attended some sessions, she was unsuccessfully dis-

---

2. The children have three different fathers. Father's appeal pertains solely to his daughter, B.J. Neither C.W.'s nor S.W.'s father appeared during the CHINS or termination proceedings.

charged. Another referral was made to CASI in the summer of 2006[,] but Mother failed to attend. A third referral to CASI was rejected by CASI as a result of Mother's previous lack of participation.

10. A final intensive outpatient program referral was made through Family Services Association in March of 2007. This program was for actual addicts and met three times per week. Prior to being discharged unsuccessfully, Mother missed thirteen of twenty[-]four sessions. She either arrived at the sessions late, or left early, approximately five times. Further, she only provided proof of minimal attendance of Narcotics Anonymous and Alcoholics Anonymous meetings.

11. Based on motivation, cooperation, participation, attitude and attendance, Mother received an average monthly report grade of "C" her first month and an "F" her second month.

\* \* \*

13. Mother blames the MCDCS family case manager for lack of services. However, other than parenting classes, Mother was provided information and referrals to services many times and failed to follow through or complete them.

14. Being overwhelmed in addressing more than one problem at a time was another reason given by Mother as to why services have not been completed, and at this time she was concentrating on work and visitation. There is no indication that Mother will be able to complete services given her history of an inability to do so in the fourteen months since services were commenced.

15. Father was progressing in services in 2006. He completed his parenting assessment and parenting classes, and was participating in intensive outpatient substance abuse treatment through CASI.

16. Home[-]based counseling was started for Father. However, Father then failed to maintain contact with his counselor and home[-]based counseling was closed out as unsuccessful. Father also failed to complete intensive outpatient treatment.

17. Both Mother and the family case manager informed Father of the date and time of this termination trial. Father still failed to appear.

18. Father has an open warrant out for battery charges. Mother is the victim.

19. Father's ability to parent is unknown at this time. Employment, if any, is unknown and Father has not produced a lease to evidence proper housing.

20. Although Father was doing well in services at one time and still visits, he has fallen into a pattern that evidences an unwillingness to finish services and be reunified with his child.

\* \* \*

24. All three children are progressing well and their separate medical and psychological needs are being met. The children do have contact with one another and there are no plans for this to change.

25. The Court concurs with the Guardian ad Litem's position that it is always best when children can be reunified with their parents. The Court further agrees with the Guardian ad Litem that too much time has passed in this case and services have not been completed.

26. It is in the children's best interests that they be given permanency and consistent caretakers throughout childhood.

Appellant App.-Father pp. 14–15. Father filed a motion to set aside judgment on June 5, 2007. Following a hearing held on June 13, 2007, the trial court issued its order denying Father's motion. This appeal ensued.

### Standard of Review

■ Initially, we note our standard of review. This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind.Ct.App.2001). Thus, when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 264 (Ind.Ct.App.2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.*

■ Here, the trial court made specific findings and conclusions thereon in its order terminating Father's and Mother's parental rights. Where the trial court enters specific findings and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake County Office of Family of Children,* 839 N.E.2d 143, 147 (Ind.2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.*

■ In deference to the trial court's unique position to assess the evidence, we will set aside the trial court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind.Ct.App.1999), *trans. denied.* A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. *In re D.D.,* 804 N.E.2d at 264. A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996). Thus, if the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.,* 717 N.E.2d at 208.

### I. Statutory Notice Requirements

■ Father argues that the letter notifying him of the termination hearing was ineffective because it was sent "to an address where [the MCDCS] knew he no longer lived." Br. of Appellant–Father at 19. Thus, Father asserts the MCDCS failed to provide him with proper notice of the termination proceeding pursuant to Indiana Code section 31–35–2–6.5 (1998 & Supp.2007).

Indiana Code section 31–35–2–6.5, which details the notice requirements in a termination proceeding, states in pertinent part:

At least ten (10) days before a hearing on a petition or motion under this chapter: the person or entity who filed the petition to terminate the parent-child relationship ... shall send notice of the review to ... [t]he child's parent ... and ... [a]ny other party to the child in need of services proceeding.

This Court has previously held that Indiana Code section 31–35–2–6.5 does not

require compliance with Indiana Trial Rule 4, which governs service of process and incorporates a jurisdictional component. *See In re A.C.*, 770 N.E.2d 947, 950 (Ind. Ct.App.2002). Instead, in order to comply with the notice statute, a party need only meet the requirements of Indiana Trial Rule 5, which governs service of subsequent papers and pleadings in the action. *Id.*

Indiana Trial Rule 5 authorizes service by U.S. mail and " '[s]ervice upon the attorney or party shall be made by delivering or mailing a copy of the papers to him at his last known address.' " *In re C.C.*, 788 N.E.2d 847, 851 (Ind.Ct.App.2003) (footnote omitted) (citing Ind. Trial Rule 5(B)), *trans. denied.* To require service of subsequent papers, such as hearing notices, to rise to the level of service of process would permit a parent or other party entitled to notice to frustrate the process by failing to provide a correct address and would add unnecessarily to the expense and delay in termination proceedings "when existing provisions adequately safeguard a parent's due process rights." *In re C.C.*, 788 N.E.2d at 851.

At the commencement of the termination hearing, Father's attorney made an oral motion to continue, claiming that the MCDCS had "constructive notice that the [Meridian Street address] wasn't [Father's] last known address because [Father] had provided a different address." Tr. p. 5.

In response to Father's motion, the following exchange took place:

The Court: Well, Ms. Brooks you are saying you knew that wasn't his address?

Brooks: What I am saying is that [Father] had told home based that he had changed [his] address and he was supposed to provide a lease that the address he had reported on the Cold Spring Road was the actual address, so to actually know if that was the address we really did not know.

The Court: Because he didn't provide you with a lease?

Brooks: Right, because he didn't provide the lease.

The Court: Well, I guess to take your Motion for Continuance further, I mean, they can only send a 10–day notice where they think the last know address is. I mean, if your client were to jump around and never provide an address we would never be sure for Trial, so I am going, I understand your position but I am going to deny the Motion.

*Id.* at 6.

The record reveals that Father's official residence with the MCDCS was 3360 North Meridian Street, Indianapolis, Indiana. Father never notified Brooks of his new address on Cold Spring Road, despite the fact that the trial court's participation decree ordered Father to "[n]otify the caseworker of changes in address . . . within five (5) days of said change." Ex. Vol 1–Father, p. 25. Brooks did, however, hear of Father's alleged change of address from Father's home-based counselor and subsequently attempted to locate Father there in order to facilitate a random drug screen. However, when Brooks went to Father's alleged new address, no one answered the door, the blinds were drawn, and she was unable to verify that Father actually resided there. Brooks also testified that she spoke with Father on the telephone one week prior to the termination hearing and specifically informed Father of the date, time, and location of the termination hearing. Mother testified that she informed Father of the date of the final termination hearing as well.

Based on the foregoing, we conclude that the trial court did not abuse its discretion in denying Father's counsel's motion to continue. By sending notice to Father's last known address on Meridian Street, the MCDCS complied with Indiana Trial Rule 5(B) and notice was therefore not defective under Indiana Code section 31–35–2–6.5. *See In re C.C.*, 788 N.E.2d at 852 (concluding notice of termination hearing was valid where notice letter was sent to homeless shelter even though caseworker knew that father no longer lived there, where homeless shelter was father's last known address, and father had failed to report change of address), *trans. denied;* also *In re T.W.*, 831 N.E.2d 1242 (Ind.Ct. App.2005) (concluding alleged failure of county office of family and children to provide mother with notice of termination hearing at least ten days prior to hearing did not violate mother's due process rights where mother's attorney informed the court that mother was informed of the date of the termination hearing, mother was present, represented by counsel, and failed to show any prejudice to her resulting from lack of notice).

## II. Procedural Due Process

 Next, Father asserts that in denying his counsel's motion to continue and thereafter proceeding with the termination hearing in Father's absence, the trial court violated his constitutional right to procedural due process.

The Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. The nature of the process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure.

*In re C.C.*, 788 N.E.2d at 852 (citations omitted). Thus, we must first identify the precise nature of the private interest threatened by the State before we can properly evaluate the adequacy of the State's process. *Id.*

 Here, the private interests implicated in this case are substantial. In particular, the action concerns Father's interest in the care, custody and control of his child, B.J., which has been repeatedly recognized as one of the most valued relationships in our society. *Id.* Moreover, it is well settled that the right to raise one's child is an "essential, basic right that is more precious than property rights." *Id.* (citing *In re Paternity of M.G.S.*, 756 N.E.2d 990, 1005 (Ind.Ct.App.2001)), *trans. denied.* Thus, Father's interest in the accuracy and fairness of the proceeding is "a commanding one." *In re J.T.*, 740 N.E.2d 1261, 1264 (Ind.Ct.App.2000), *trans. denied.*

The second factor requires an assessment of the risk of error created by the challenged procedure; namely, proceeding without Father's physical presence. *Id.* We observe that Indiana Code section 31–35–2–6.5(e) states that the court shall provide a party with an "opportunity to be heard ... at the hearing." However, this statutory provision does not create a constitutional right for Father to be physically present at the termination hearing. *See In re E.E.*, 853 N.E.2d 1037, 1044 (Ind.Ct. App.2006) (stating that parent does not have a constitutional right to be present at a termination hearing), *trans. denied; see also In re J.T.*, 740 N.E.2d at 1264 (stating that incarcerated parent has no absolute right to be physically present at the termi-

nation hearing). Here, Father was zealously represented by counsel throughout the entire termination hearing. Moreover, Father's counsel was provided with the opportunity to cross-examine the State's witnesses and to introduce evidence in defense of the action.

Under these circumstances, we have recognized that the risk of an inaccurate result decreases significantly. *See id.* Additionally, Father fails to allege any specific prejudice other than his unsubstantiated assertion that "had he been allowed to meaningfully participate, it is likely that termination would not have been ordered. [Father] has established prejudice." Br. of Appellant–Father at 23. Based on the foregoing, we conclude that the risk of error caused by the trial court's denial of Father's counsel's motion to continue was minimal.

■■■ The final factor to consider is the countervailing government interest. The State's *parens patriae* interest in protecting the welfare of B.J., as well as the other children, is significant. "Although the State does not gain when it separates children form the custody of fit parents, the State has a compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment are at issue." *Tillotson v. Clay County Dep't of Family and Children,* 777 N.E.2d 741, 745 (Ind.Ct.App.2002), *trans. denied* (quotation omitted).

In the present case, the MCDCS filed its CHINS petition on February 7, 2006. The children were removed by dispositional decree on March 3, 2006 and the final termination hearing was held May 17, 2007. Thus, approximately fourteen months had passed since the children were removed from the care of their parents and made wards of the State. Additionally, we observe that as of the date of the final termination hearing, Father had failed to complete the court-ordered services, which made it impossible for Brooks to predict when or if Father would ever be eligible for reunification with B.J. We have recognized that delays in the adjudication of a case "impose significant costs upon the functions of government as well as an intangible cost to the lives of the children involved." *Id.*

After balancing the substantial interest of Father with that of the State, and in light of the minimal risk of error created by the challenged procedure, we conclude that the trial court did not violate Father's constitutional right to due process of law when it denied Father's counsel's motion to continue and proceeded with the termination hearing in Father's absence.[3]

### III. Clear and Convincing Evidence

Finally, Father and Mother both assert that the trial court's termination order was clearly erroneous.

■■■ The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester,* 839 N.E.2d at 147. Moreover, as we stated earlier, a parent's interest in the care, custody, and control of his or her children

---

3. Father also asserts that he was denied his constitutional right to due process when the MCDCS failed to provide him with a case plan during the CHINS proceedings. Father waived any due process challenge to the adequacy of the CHINS proceeding because he failed to object during the CHINS proceedings and did not raise his constitutional claim at the termination hearing. *See McBride v. Monroe County Office of Family and Children,* 798 N.E.2d 185, 198 (Ind.Ct.App.2003) (concluding that mother waived her due process challenge to the adequacy of the CHINS proceeding because she did not object during that proceeding or raise her constitutional claim at the termination hearing).

is perhaps the oldest of our fundamental liberty interests. *Id.* However, these parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re M.B.,* 666 N.E.2d 73, 76 (Ind.Ct.App. 1996), *trans. denied.* Parental rights may therefore be terminated when the parents are unable or unwilling to meet their parental responsibilities. *In re K.S.,* 750 N.E.2d at 836.

In order to terminate a parent-child relationship, the State is required to allege and prove that:

(A) [o]ne (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

* * *

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b)(2) (1999 & Supp. 2007). The State must establish each of these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1234 (Ind.1992).

### A. Father

Father does not challenge the trial court's determination that (1) B.J. had been removed from his care for more than six months under a dispositional decree, (2) termination was in B.J.'s best interest, and (3) that the MCDCS had a satisfactory plan for B.J. should termination occur, namely: adoption. Father does assert, however, that the MCDCS failed to prove by clear and convincing evidence that there exists a reasonable probability that the conditions that resulted in B.J.'s removal and continued placement outside the family home will not be remedied. Specifically, Father asserts that he had "completed or almost completed each requirement in the court's participation Decree[,]" that he "remained working with home based services until March or April of 2007[,]" and that he visited B.J. consistently throughout the CHINS and termination proceedings. Br. of Appellant–Father at 17–18.

When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.,* 742 N.E.2d 509, 512 (Ind.Ct.App.2001), *trans. denied.* In so doing, the trial court may consider the parent's response to the services offered through the department of child services. *Lang v. Starke County Office of Family and Children,* 861 N.E.2d 366, 372 (Ind.Ct.App.2007), *trans. denied.* "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Id.* Additionally, the MCDCS was not required to rule out all possibilities of change; rather, it needed to establish "only that there is a reasonable proba-

bility that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind.Ct.App.2007).

The MCDCS became involved in this case because of the parents' neglectful treatment of the children. Specifically, with regard to Father, the children were not initially placed with him because he had failed to establish paternity of B.J. and because he had "failed to show an ability or willingness to appropriately parent the children." Ex. Vol. 1–Father, p. 3. Father admitted to these allegations.

Unfortunately, a review of the record reveals that despite Father's initial compliance, and despite a multitude of services offered to Father over a fourteen-month period, these conditions still had not improved. Although Father continued to exercise visitation with B.J., at the time of the termination hearing, Father had still not completed substance abuse intensive outpatient treatment or home-based counseling. Father also had failed to submit to paternity testing, had failed to provide proof of stable housing, and had failed to provide proof of any employment. Father also failed to attend the termination hearing despite receiving advanced notice of the time, date and location of the hearing from his case manager.

This evidence clearly supports the trial court's finding that "Father's ability to parent is unknown at this time[,]" and its ultimate conclusion that "[t]here is a reasonable probability that the conditions that resulted in the removal of the children from [Father] ... will not be remedied." Appellant's App.-Father pp. 15–16. Father's arguments to the contrary amount to *nothing more than an invitation for us to reweigh the evidence* and reach a different conclusion than the trial court. This we may not do. *See In re L.S.*, 717 N.E.2d at 208 (stating if the evidence and infer-

ences support the trial court's decision, we must affirm).

## B. Mother

Mother, too, challenges the sufficiency of the evidence supporting the trial court's judgment terminating her parental rights to the children. Specifically, Mother claims that the trial court's twelfth finding is not supported by the evidence. Additionally, other than the requirement that the MCDCS must have a satisfactory plan for the care and treatment of the children, Mother also challenges each element of Indiana Code section 31–35–2–4(b)(2). We address each argument in turn.

### 1. Finding Number Twelve

Mother first claims that the trial court's twelfth finding of fact is wholly unsupported by the evidence. Mother is correct.

 Finding number twelve reads, "Mother admitted testing positive for cocaine during treatment. The Court does not accept her excuse for testing positive as coming from just touching the drug." Appellant's App.-Mother p. 12. The State concedes in its brief that, "[t]he trial court improperly stated as a finding that 'Mother admitted testing positive for cocaine during treatment' because, as [Mother] asserts in her brief, the trial court struck her answer from the record based upon her attorney's objection." Br. of Appellee at 7 (citing Tr. pp. 19–20).

 A court on review must determine whether the specific findings are adequate to support the trial court's decision. *In re Estate of Inlow*, 735 N.E.2d 240, 250 (Ind.Ct.App.2000). This Court is to disregard any special finding that is not proper or competent to be considered. *Riehle v. Moore*, 601 N.E.2d 365, 369 (Ind.Ct.App. 1992). Additionally, such a finding cannot form the basis of a conclusion of law. *Id.*

We may reverse a trial court's judgment, however, only if its findings constitute prejudicial error. *Id.* A finding of fact is not prejudicial to a party unless it directly supports a conclusion. *Id.*

In this case, the trial court's twelfth finding was erroneous because it was based on evidence stricken from the record. Because said finding is clearly in error, it would be cause for reversal if it were the "sole support for any conclusion of law necessary to sustain the judgment of the court." *Id.* After examining the entire judgment, however, we have determined that the erroneous finding does not constitute the sole support for any conclusion of law necessary to sustain the judgment. Disregarding the erroneous finding, we conclude that findings 5, 8, 9, 10, 11, 13 and 14, *see supra* pp. 3–5, which are supported by evidence on the record, provide ample support for the trial court's ultimate conclusion that the MCDCS proved by clear and convincing evidence: (1) there was a reasonable probability that the conditions resulting in removal and continued placement of the children outside Mothers care would not be remedied and (2) that termination was in the best interests of the children. *See* discussion *infra* parts 3 and 4. Because there is evidence sufficient to support the trial court's ultimate findings on the elements necessary to sustain the judgment, we hold that the erroneous finding was merely harmless surplusage that did not prejudice Mother and, consequently, is not grounds for reversal.

### 2. *Removed from Care*

■ Next, Mother asserts that the MCDCS failed to prove that the children had been removed from her care for the statutorily-mandated period of time and thus the trial court's judgment must be reversed.

■ Indiana Code section 31–35–2–4(b)(2)(A), in relevant part, requires that the termination petition must allege that:

(A) *one (1) of the following exists:*

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(ii) a court has entered a finding … that reasonable efforts for family preservation or reunification are not required … *or*

(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen months of the twenty-two (22) months. . . .

(Emphasis added.) The words "and" and "or" as used in statutes are not interchangeable, being strictly of a conjunctive and disjunctive nature respectively. *Bourbon Mini Mart, Inc. v. Comm'r, Indiana Dep't of Envtl. Mgmt.,* 806 N.E.2d 14, 20 (Ind.Ct.App.2004). Moreover, "or" is defined as "a function word to indicate an alternative, the equivalent or substitutive character of two words or phrases." *Id.* (citing Merriam–Webster Online, at http://www.merriam-webster.com (last visited December 2007)). Clearly, subsection (b)(2)(A) is written in the disjunctive. *See also In re L.S.,* 717 N.E.2d at 209 (stating that Indiana Code section 31–35–2–4(b)(2)(A) is written in the disjunctive). Thus, the MCDCS was required to allege and prove only one of the enumerated elements in subsection (A), which it did. The children were formally removed from the care of Mother and Father pursuant to a dispositional decree on March 3, 2006. The termination hearing was held approximately fourteen months later, on May 17, 2007. Therefore, the MCDCS proved by clear and convincing evidence that the children had been removed from the parents' care for well over the six-month minimum

requirement. Mother insists, however, that "[t]he requirement that a child have been removed from his or her parent for fifteen out of twenty-two months pertains to termination petitions filed after July 1, 1999." Br. of Appellant–Mother at 10.

The first step in interpreting any Indiana statute is to determine whether the legislature has spoken clearly and unambiguously on the point in question. *Kinslow v. GEICO Ins. Co.*, 858 N.E.2d 109, 114 (Ind.Ct.App.2006). If a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. *Id.* The language of this statute is clear and unambiguous. It requires that the MCDCS allege and prove by clear and convincing evidence *one* of the three elements delineated in subsection (b)(2)(A), which it did. As the State correctly points out, "[t]o read [Indiana Code section 31–35–2–4(b)(2)(A)(iii) ] the way [Mother] advises would eviscerate the statute rendering meaningless [subsections] 4(b)(A)(i) and (ii)." Br. of Appellee at 8.

### 3. Conditions Requiring Removal Not Remedied

Mother next contends that the MCDCS failed to prove by clear and convincing evidence that the conditions that resulted in the removal and continued placement of the children outside her care would likely not be remedied. Thus, Mother concludes, the trial court's judgment terminating her parental rights is clearly erroneous.

As stated earlier, when determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d at 512. However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.*

Here, Mother makes several assertions supporting her position that the MCDCS failed to present sufficient evidence that the conditions requiring the children's removal would not be remedied, including her contention that she "fully complied with six of the trial court's eight requirements and continued to make substantial progress towards compliance[,]" that she "maintained consistent contact with her children throughout this case[,]" and she had made "significant strides towards completing the court-ordered substance abuse treatment." Br. of Appellant–Mother at 12–14.

Like Father, Mother's assertions ask this court to reweigh the evidence, which we cannot do. The evidence most favorable to the trial court's judgment reveals that while Mother did successfully complete her parenting assessment and parenting classes, as well as exercise visitation with the children, Mother's visitation had to be suspended for approximately four months due to her missed visits. Moreover, Mother failed to obtain mental health treatment for her depression despite multiple reminders from her case manager that such treatment was a condition for reunification. Likewise, despite at least three separate referrals for intensive outpatient treatment for her substance abuse problem, which was the impetus for the MCDCS's initial involvement in this case, Mother failed to complete treatment and was unsuccessfully discharged due to her lack of participation. She also provided only minimal proof of attendance at Nar-

cotics Anonymous and Alcoholics Anonymous meetings.

■ When making its decision regarding the involuntary termination of parental rights, the trial court need not rule out any possibility of change, but merely has to determine that there is a reasonable probability that a parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. Moreover, a trial court need not wait until the children are "irreversibly influenced" such that their physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *A.F.,* 762 N.E.2d at 1253. Based on the foregoing, we find the evidence most favorable to the trial court's judgment supports its findings, including finding fourteen which reads, "There is no indication that Mother will be able to complete services given her history of an inability to do so in the fourteen months since services commenced." Br. of Appellant–Mother at 12. We therefore conclude that the trial court's ultimate determination that there existed a reasonable probability that the conditions leading to the removal and continued placement of the children outside of mother's care would not be remedied was not clearly erroneous.[4]

### 4. Best Interests of the Children

■ Lastly, we address Mother's contention that the MCDCS failed to prove by clear and convincing evidence that termination of her parental rights was in the best interests of the children.

■ We are mindful that in determining what is in the best interests of the children, the court is required to look beyond the factors identified by the office of

family and children, and look to the totality of the evidence. *McBride,* 798 N.E.2d at 203. The purpose of terminating parental rights is not to punish the parents, but to protect the children involved. *In re K.S.,* 750 N.E.2d 832, 836 (Ind.Ct.App. 2001). However, in determining the best interests of the children, the trial court must subordinate the interests of the parents to those of the children. *McBride,* 798 N.E.2d at 203.

The thrust of Mother's argument here focuses on Guardian ad Litem Noreen Pierle's testimony regarding the foster families' abilities to care for the children, claiming that Pierle's comment that she considered "who is in the best position to meet the child's needs and parent them the best way they can[,]" was "inappropriate." Br. of Appellant–Mother at 18–19.

Mother is correct in her assertion that the right of parents to raise their children should not be terminated solely because there is a better home available for the children. *See In re K.S.,* 750 N.E.2d at 837. Our review of the evidence, however, does not reveal that the trial court's termination of Mother's parental rights was based on who could provide a "better" home for the children, but instead was properly based on the inadequacy of mother's custody. *See In re V.A.,* 632 N.E.2d 752, 756 (Ind.Ct.App.1994) (stating that it is the inadequacy of parental custody, not the superiority of an available alternative, that determines whether parental rights should be terminated).

At the time of the termination hearing, the evidence most favorable to the trial court's judgment reveals that Mother had

---

4. Having determined that the trial court's conclusion regarding the remedy of conditions is not clearly erroneous, we need not address Mother's assertion that the MCDCS failed to prove that the continuation of the parent-child relationship posed a threat to the well-being of the children. *See* Ind.Code § 31–35–2–4(b)(2)(B); *see also In re L.S.,* 717 N.E.2d at 209 (stating Indiana Code § 31–35–2–4(b)(2)(B) is written in the disjunctive).

not completed court-ordered services. Most notably, Mother had failed to complete an intensive outpatient program for her substance abuse problem despite three separate referrals. Additionally, Mother had failed to obtain mental health treatment for her depression, and had not completed any home-based counseling. At trial, Case Manager Brooks testified that, "[A]t this particular time the parents have not done what is needed to reunify with the children." Tr. p. 78. Additionally, Guardian ad Litem Pierle testified, "Well[,] always I would like to see the children stay with their natural parents but I realize that is not always the case and [B.J.] does have extensive issues with her celiac disease and ... it is going to be costly and it is going to take somebody that has medical insurance .... she has been at the foster home since ... practically her birth and I do think they are probably in a better position at this period in time then their natural mother to take care of them." *Id.* at 102. The record also supports the trial court's finding that "[a]ll three children are progressing well and their separate medical and psychological needs are being met." Br. of Appellant–Mother at 13.

Recognizing that the trial court listened to the testimony of all witnesses, observed their demeanor, and judged their credibility, as a reviewing court we must give proper deference to the trial court. *In re T.F.,* 743 N.E.2d 766, 776 (Ind.Ct.App. 2001), *trans. denied.* Based on the totality of the evidence, we are convinced that the evidence supports the trial court's conclusion that termination of Mother's parental rights was in the children's best interests.

### Conclusion

In sum, the MCDCS did not fail to fulfill its statutory obligation to provide Father with notice of the termination hearing, nor was Father's constitutional right to due process violated when the MCDCS sent notice of the termination hearing to Father's last known address pursuant to Indiana Code section 31–35–2–6.5. Moreover, Father was not denied his constitutional right to due process when the trial court denied his counsel's motion to continue and proceeded with the termination hearing in Father's absence. Father's constitutional right to be heard does not include an absolute right to be physically present in the courtroom. Finally, the MCDCS proved by clear and convincing evidence each element of Indiana Code section 31–35–2–4(b) with regard to both Father and Mother. Accordingly, the trial court's judgment ordering the involuntary termination of Father's and Mother's parental rights to C.W., S.W. and B.J. is not clearly erroneous.

Affirmed.

FRIEDLANDER, J., and ROBB, J., concur.