902 N.E.2d 316 (2009)
In the Matter of the Involuntary Termination of the Parent-Child Relationship of E.D., Minor Child, and His Mother,
Sabrina Daniel a/k/a Sabrina James, Appellant-Respondent,
v.
Marion County Department of Child Services, Appellee-Petitioner, and
Child Advocates, Inc., Co-Appellee (Guardian Ad Litem).
No. 49A04-0808-JV-492.
Court of Appeals of Indiana.
March 12, 2009.
*317 Jill M. Acklin, Westfield, IN, Attorney for Appellant.
Christopher S. Young, Rochester, IN, Attorney for Appellee Marion County Department of Child Services.

OPINION
CRONE, Judge.
Sabrina Daniel a/k/a Sabrina James ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her son, E.D., claiming that the trial court denied her due process rights when it denied her request to continue the termination hearing. We affirm.
Mother's son, E.D., was born on February 15, 2007. On February 20, 2007, the Marion County Department of Child Services ("DCS") filed a petition alleging E.D. was a child in need of services ("CHINS") based on allegations that Mother had exhibited bizarre behavior at the hospital following E.D.'s birth, which resulted in Mother being detained in the hospital psychiatric ward, and that Mother was homeless and had untreated mental health issues that posed a risk to E.D. DCS placed E.D. in a foster home, where he remained until the termination hearing. The CHINS petition also indicated that Mother had her parental rights involuntarily terminated as to eight of her other children. The removal and termination of parental rights as to one of these eight children occurred in Marion County in *318 2005 and resulted in that child being adopted by a great aunt. During that child's CHINS and termination proceedings, Mother had limited contact with DCS. The removal and termination of parental rights as to the remaining children occurred in Alabama, and those children also lived with the great aunt.
Following E.D.'s removal from Mother's care and during the CHINS proceedings, DCS was unable to locate Mother, and she made no effort to contact DCS regarding E.D. In June 2007, the trial court held a default hearing and found E.D. to be a CHINS. The trial court ordered that no services would be offered or ordered until Mother contacted DCS and appeared in court to demonstrate a desire and an ability to care for E.D.
In September 2007, DCSstill unable to locate Mother's whereaboutsfiled a motion, pursuant to Indiana Code Section 31-34-21-5.6, for a hearing on the reasonable efforts requirement. Following a hearing on DCS's motion, the trial court granted the motion, finding that DCS was not required to make reasonable efforts to reunify Mother with E.D. Thereafter, on October 5, 2007, DCS filed a petition to terminate Mother's parental rights to E.D.
In December 2007, DCS became aware that Mother was incarcerated at Rockville Correctional Facility. The Guardian Ad Litem ("GAL") assigned to E.D. sent a letter to Mother at the prison, but Mother never responded. The trial court appointed counsel for Mother and scheduled a termination hearing for March 18, 2008.
On March 3, 2008, Mother's attorney filed a motion to continue, in which counsel indicated that she had visited Mother in prison in February 2008, that she believed that Mother's mental illness had "substantially improved" since her incarceration, but that she did not believe that Mother could provide informed consent to adoption. Appellant's App. at 49. Mother's counsel requested a continuance of the termination hearing so that counsel and DCS could obtain Mother's medical records. The trial court continued the hearing on its own motion and entered an order granting Mother's counsel and DCS's joint request for the Rockville Correctional Facility to release Mother's mental health records to them. The trial court also appointed a GAL to review Mother's mental health records and interview Mother in order to ascertain Mother's mental condition and capacity to sign a consent to adoption.
The GAL appointed to represent Mother's interests obtained and reviewed Mother's medical records from Wishard Hospital, Community Hospital, Gallahue Mental Health Services, and the Department of Correction. When the GAL visited Mother in prison, he found that she did not give appropriate responses to questions asked. The GAL filed a report, in which the GAL opined that Mother was "incapacitated and unable to give her consent to the adoption of her son, [E.D.]." Exhibits Volume at 17. The GAL's report also indicated that Mother had expressed a desire to keep her child and did not want to consent to adoption.
On July 22, 2008, the trial court held a termination hearing, at which Mother was represented by counsel and appeared telephonically from prison. At the beginning of the termination hearing, DCS and Mother's attorney stipulated to the admission of some documents into evidence, including some of Mother's medical records from the Rockville Correctional Facility as well as the report from Mother's GAL. Mother's counsel then asked the trial court to continue the hearing based on counsel's assertion that Mother was unable to assist in her defense. Specifically, Mother's counsel stated:

*319 Your Honor, my client is of course on the line and we've had a couple of meetings with her. One between her and I and with, and one between she and I and the Guardian Ad Litem. [Mother] doesn't want to relinquish her child in a termination proceeding but my main concern with respect to going forward with this case, is that she, according to the Guardian Ad Litem's report, has serious mental health issues and is incapable, and is incapacitated and unable to give even a consent in this case. My concern from looking at the Rockville [Correctional Facility] records, is that she does not appear to have been, that they have made any effort to diagnose her mental health issues, or to treat them. And I think under those circumstances, it would deny her due process to go forward where she is apparently not able to either assist in her own defense or consent if consent became an issue. She's apparently lingering in a situation where they're not attempting to diagnose or treat her, and therefore, she is not able to effectively assist me in her own defense in this matter. So we would ask that the case be continued. That the Court order the [prison] facility to conduct an appropriate inquiry into her mental health status and provide appropriate treatment for her. I don't know that it has gone into much detail in [the Guardian Ad Litem's] report, but she has mental health records from several other facilities here in Indianapolis. The Rockville Facility apparently did not make any attempt to get those records or to find out what really her issues were. And I think that's a, a rather significant omission on their part. I think if they[']re going to have her incarcerated, they're obligated to address and treat her issues.
Tr. at 6.
DCS and the GAL opposed continuing the termination hearing. DCS responded that because the termination proceeding was not a criminal matter, Mother's competency to stand trial was not at issue. DCS also stated that because the trial court had granted DCS's no reasonable efforts motion, the issue of Mother not having received mental health services was moot. Counsel for the GAL stated that this case had been pending since February 2007 when the CHINS case was filed and that it was in E.D.'s "best interest to have permanency and to proceed as soon as possible." Id. at 7.
The trial court denied Mother's motion to continue, stating:
Okay. [DCS's counsel] is right, it's not a criminal case where they, someone is incapable of standing trial and they're sent to Logansport to stabilize. I guess any kind of case like this we would never, maybe never have a trial if someone is mentally ill. The reportjust says adjustment disorder with anxiety. Which I assume is a pretty good diagnosis for anyone who's in jail.... And I don't think I have any jurisdiction to order them to do that.... I understand your motion but we'll, I'll deny the motion to continue.
Id.
DCS and the GAL called witnesses, and Mother's counsel cross examined them. The trial court cleared the courtroom and allowed Mother to consult privately with her attorney on two occasionsonce after direct examination of the family case manager and again after DCS and the GAL had rested their cases. The trial court gave Mother an opportunity to present evidence, but she did not testify or call witnesses. The trial court took the matter under advisement, and thereafter, issued its findings of fact and conclusions thereon *320 terminating Mother's parental rights to E.D. The trial court found in relevant part:
11. [E.D.] is the youngest of Mother's nine children. His eight siblings reside with their great-aunt.
12. The great-aunt has adopted one of the eight siblings, [N.], who was the subject of the 2005 termination of parental rights case. Mother's mental health issues were a reason [N.] came to the attention of DCS.
13. Mother had little contact in [N.]'s case, last speaking with the family case manager in January 2005. Mother has had no contact in [E.D.]'s cases.
14. Given Mother's history of being unable or unwilling to participate in [N.]'s CHINS case, resulting in having her parental rights terminated, her total lack of contact in [E.D.]'s cases, and her lack of parenting her other seven children, there is a reasonable probability that the conditions that resulted in [E.D.]'s removal and placement outside the home will not be remedied.
15. [E.D.] has been placed with one foster family since he was released from the hospital. He has bonded with the family. [The GAL] has observed the interaction between [E.D.] and his foster parents as loving and feels he is thriving.
16. [E.D.]'s placement is pre-adoptive.
17. [E.D.] has some delayed development for which the foster family is providing therapy and making sure his needs are being met.
18. The pre-adoptive foster parents provide interaction between [E.D.] and his siblings in his great-aunt[']s care.
19. Continuation of the parent-child relationship poses a threat to the well-being of [E.D.]. Mother's parenting and mental health issues make it questionable whether she could provide [E.D.] a safe and stable environment where his special needs would be met. Foremost, Mother has not seen [E.D.] since he was one day old, and his foster family is the only family that he has known.
20. Termination of the parent-child relationship is in [E.D.]'s best interests to provide the opportunity for him to be adopted into a permanent, stable, and loving home in which he has resided since birth and has become bonded. Mother is still unavailable to parent and she has made no effort to participate in the CHINS and termination cases. To provide her with additional time would only delay the goal of providing [E.D.] with permanency.
21. There is a satisfactory plan for the care and treatment of the child, that being adoption.
22. Based upon the care and love that [E.D.] is receiving, his bond with the only family he has known, and the lack of contact Mother has had in these proceedings, [the GAL] agrees that the plan of DCS for termination and adoption is in [E.D.]'s best interests.
Appellant's App. at 16-17.
On appeal, Mother argues that she was denied due process of law when the trial court denied her request to continue the termination hearing. Mother's request to continue the termination petition was premised on her attorney's assertion that Mother had serious mental health issues and "was not able to effectively assist [counsel] in her own defense[.]" Tr. at 6. Mother's counsel asked the trial court to order the prison to "conduct an appropriate inquiry into [Mother's] mental health status and provide appropriate treatment for her." Id. On appeal, Mother claims that her inability to assist in her defense in this termination proceeding should be treated the same as a situation in which a criminal defendant is found to be incompetent *321 to stand trial, and she asserts that "this case should be remanded to the juvenile court for an assessment of [Mother's] competence before subjecting her to the involuntary termination of her parental rights." Appellant's Br. at 15.
DCS contends that a criminal proceeding and a termination proceeding are not comparable and neither are the due process procedures involved in each proceeding. DCS also asserts that Mother's due process rights "were fully protected by virtue of her representation by counsel" during the termination hearing and the fact that Mother was present during the termination hearing and had the opportunity to consult with counsel and present testimony. Appellee's Br. at 15. Thus, DCS argues that the trial court properly denied Mother's request to continue the termination hearing.
A trial court's ruling on a motion for continuance in a termination of parental rights case is reviewed for an abuse of discretion. See J.M. v. Marion County Office of Family & Children, 802 N.E.2d 40, 43 (Ind.Ct.App.2004), trans. denied. Regarding the process due to a parent in a termination proceeding, we have explained that in addition to statutory protections,[1]
[t]he Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. The nature of the process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure.
In re C.C., 788 N.E.2d 847, 852 (Ind.Ct. App.2003) (citations omitted), trans. denied.
In termination cases, both the private interests of a parent and the countervailing governmental interests that are affected by the proceeding are substantial. Id. In particular, this termination action concerns Mother's interest in the care, custody and control of her child, which has been repeatedly recognized as one of the most valued relationships in our society. Id. Additionally, it is well settled that the right to raise one's child is an "essential, basic right that is more precious than property rights." Id. Thus, Mother's interest in the accuracy and justice of the proceeding is a "commanding" one. Id.
On the other hand, the State's parens patriae interest in protecting the welfare of the child is also significant. Id. "Although the State does not gain when it separates children from the custody of fit parents, the State has a compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment are at issue." Tillotson v. Clay County Dep't of Family & Children, 777 N.E.2d 741, 745 (Ind.Ct.App.2002) (citation *322 and quotation marks omitted), trans. denied.
Here, E.D. was removed from Mother's care and placed in a foster home in February 2007 after Mother exhibited bizarre behavior, which posed a risk to E.D., at the hospital following his birth. Throughout the CHINS proceeding, DCS was unable to locate Mother, and Mother neither saw E.D. nor contacted DCS regarding E.D. The trial court had already once continued the termination hearing to allow Mother to obtain medical records and allow a GAL to interview and represent Mother's interests in the termination proceeding. Mother was in prison at the time of the termination hearing, which occurred on July 22, 2008. Thus, approximately one and one-half years, which was the entire length of E.D.'s young life, had passed between E.D.'s removal and his termination hearing. "While continuances may be necessary to ensure the protection of a parent's due process rights, courts must also be cognizant of the strain these delays place upon a child." In re C.C., 788 N.E.2d at 853.
When balancing the competing interests of a parent and the State, we must also assess the risk of error created by the challenged procedure. Mother contends that the risk of error is great because by denying her request to continue the termination hearing, she was denied her due process rights to assist counsel in her defense and understand the proceedings against her. We cannot agree.
The due process safeguards afforded a defendant in a criminal trial are not applicable to a parent in a civil termination proceeding. Indeed, our Indiana Supreme Court has recognized that "criminal prosecutions and termination proceedings are substantially different in focus. The resolution of a civil juvenile [termination] proceeding focuses on the best interests of the child, not on guilt or innocence as in a criminal proceeding." Baker v. Marion County Office of Family & Children, 810 N.E.2d 1035, 1039 (Ind.2004) (explaining that the inquiry into whether a parent's counsel in a termination proceeding was effective is not the same Strickland inquiry used in criminal cases). Mother's contention that a termination hearing for an incompetent parent should be continued until the parent is able to achieve the competency necessary to assist counsel runs contrary to a termination proceeding's purpose of protecting the child and trying to achieve stability and permanency for the child and could result in an inordinate delay. Delays in the adjudication of a termination case "impose significant costs upon the functions of the government as well as an intangible cost to the lives of the children involved." D.A. v. Monroe County Dep't of Child Servs., 869 N.E.2d 501, 510 (Ind.Ct.App.2007).
Furthermore, Mother's rights in this termination hearing were not significantly compromised. Although Mother had no constitutional right to be present at the termination hearing, see In re C.C., 788 N.E.2d at 853, the trial court allowed her to participate telephonically in the hearing from prison. Mother was represented by counsel throughout the termination proceedings. Mother's counsel was provided with the opportunity to cross-examine the State's witnesses, and in fact did so, as well as the opportunity to introduce evidence in defense of the action, which counsel chose not to do after consulting with Mother. Under these circumstances, we have recognized that the risk of an inaccurate result decreases significantly. See In re J.T., 740 N.E.2d 1261, 1264 (Ind.Ct.App. 2000), trans. denied, abrogated on other grounds by Baker, 810 N.E.2d 1035. Additionally, Mother fails to allege any specific prejudice that resulted from her alleged *323 inability to assist counsel. Based on the foregoing, we conclude that the risk of error caused by the trial court's denial of counsel's continuance request was minimal.
After balancing the substantial interest of Mother with that of the State, and in light of the minimal risk of error created by the challenged procedure, we conclude that, under the facts of this case, the trial court did not deny Mother due process of law when it denied counsel's request to continue the termination hearing.
Affirmed.
ROBB, J., and BROWN, J., concur.
NOTES
[1] A parent's statutory protections in a termination proceeding include Indiana Code Section 31-35-2-6.5(e) and Indiana Code Section 31-32-2-3(b). Indiana Code Section 31-35-2-6.5(e), which governs hearings for petitions to terminate a parent-child relationship, provides that "[t]he court shall provide to a [parent] an opportunity to be heard and make recommendations to the court at the hearing." Indiana Code Section 31-32-2-3(b) provides that in proceedings to terminate the parent-child relationship, "[a] parent ... is entitled: (1) to cross-examine witnesses; (2) to obtain witnesses or tangible evidence by compulsory process; and (3) to introduce evidence on behalf of the parent[.]"