## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 21 2016, 8:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Schrontz
Schrontz Legal Group, LLC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of I.L. (Child) and K.D.W. (Father);

K.D.W. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

September 21, 2016

Court of Appeals Case No. 79A02-1603-JT-464

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge
The Honorable Tricia L. Thompson, Magistrate

Trial Court Cause No. 79D03-1507-JT-65

**May, Judge.**

K.D.W. ("Father") appeals the termination of his parental rights to I.L. ("Child"). Father raises four issues, which we restate as:

1. whether the court's findings of fact support the court's conclusion of law that there was a reasonable probability the conditions resulting in Child being in continued placement outside Father's home would not be remedied;

2. whether the court's findings of fact support the court's conclusion of law that continuation of the parent-child relationship poses a threat to the well-being of Child;

3. whether the court's findings of fact support the court's conclusion of law that Tippecanoe County Department of Child Services ("DCS") has a satisfactory plan for the care of Child; and

4. whether the court's conclusion of law that termination was in Child's best interest was supported by the evidence.[1]

We affirm.

# Facts and Procedural History

I.L. was born on June 17, 2012, as the fourth of five children born to C.S. ("Mother").[2] On April 16, 2014, DCS began receiving reports that I.L.'s

---

[1] We interpret this argument to allege the insufficiency of both the evidence to support the court's findings of fact and the insufficiency of the findings of fact to support the conclusions of law. *See In re N.G.*, 51 N.E.3d 1167, 1170-71 (Ind. 2016) (interpreting an assertion the evidence did not support the judgment to challenge the sufficiency of the evidence to support the findings and the findings to support the conclusions).

[2] Mother voluntarily terminated her parental rights to all five of her children and did not appeal. Additional facts regarding Mother and Child's half-siblings will be provided only as necessary to set the stage for the facts and procedure relevant to Father and Child.

younger brother was not thriving. Investigation revealed Mother had participated in an Informal Adjustment in 2013, Mother's children lacked appropriate supervision or housing, the children were dirty and unkempt, and the youngest child was not thriving.

[3] DCS filed a Child in Need of Services ("CHINS") petition on May 22, 2014. The court held a detention hearing on June 24, 2014, and placed Child with the maternal grandmother and a maternal aunt. In July 2014, genetic testing confirmed Father's paternity of Child, and he attended the CHINS fact-finding hearing on July 18, 2014. On July 24, 2014, the court adjudicated Child a CHINS and entered a dispositional decree that required Father to, among other things, attend all hearings and visitations; remain in contact with DCS; maintain a stable source of income; maintain safe housing suitable for Child; not consume legend drugs or controlled substances without a prescription; not consume alcohol; submit urine for drug screens on request; obey the law; participate in a Fatherhood Engagement program; and follow any recommendation from required assessments for parenting, mental health, and substance abuse.

[4] The court held review hearings on October 14, 2014, and January 20, 2015. Father appeared for the hearing in October, but he was intoxicated and belligerent, which led to his being held in contempt. Father did not appear for the hearing in January 2015.

[5]     Permanency planning hearings were held on April 21, 2015, and July 31, 2015. At the July hearing, the court changed the permanency plan from reunification to termination of parental rights and adoption of Child. Evidentiary hearings on the termination petitions were held on October 2, 2015, and October 30, 2016.

[6]     On February 1, 2016, the trial court terminated Father's parental rights in an order that provided, in pertinent part:

FINDINGS OF FACT

* * * * *

6. [Father] knew that he was a potential father of [Child] due to a prior investigation in March of 2013. [Father] made no efforts to establish paternity or remove [Child] from the conditions of Mother's home prior to the involvement of DCS in May of 2014. Genetic testing conducted in July 2014 confirmed [Father] is the biological parent of [Child].

* * * * *

9. DCS filed a Request to Take Children into Custody on June 23, 2014 and a Detention Hearing was held on June 25, 2014. [Child] was placed in relative foster care at that time. [Child] has remained out of parents' care continuously since that date.

10. [Child] was found to be a Child in Need of Services ("CHINS") and dispositional orders were issued . . . on July 24, 2014.

11. Pursuant to the dispositional orders . . . Father was offered the following services: random drug screens, parenting and bonding assessments, mental health assessment and services, Fatherhood Engagement program and services, and substance abuse assessment and services. These services were exhaustive and were designed to address the parents' difficulties.

12. Case conferences, family team meetings, and review hearings were held periodically. DCS and CASA prepared separate written reports and recommendations prior to each hearing.

13. A permanency hearing was held on July 31, 2015 at which time the permanent plan for [Child] was determined to be initiation of proceedings for termination of parental rights and adoption. DCS filed its petition and the evidentiary hearings on the Verified Petition to Terminate Parental Rights were held on October 2, 2015 and October 30, 2015. . . .

14. Father is not able to provide a safe and stable home for the child. Father has failed to demonstrate a reliable, stable means of providing for the child's needs. Father has failed to make the needs of the child a priority.

15. Throughout the CHINS case, Father lived on and off with Paternal Grandmother. Father often stayed with friends and also resided with at least two different girlfriends. At times, Father lived "in and out of the streets." Approximately one month prior to the evidentiary hearing, Father and his girlfriend of four months rented an apartment together. Even though this is the first time Father has obtained housing in his own name, he misrepresented his employment on the rental application.

16. Father was employed at the beginning of the CHINS case until February of 2015. Father remained unemployed until August of 2015 when he began working at a bar. Father was

terminated from the bar the first week of September and reports he was fired because a woman thought he was doing something wrong to her. On the second day of the termination hearing, Father testified he had been employed at Indiana Packers for approximately two weeks. Although Father has generally been able to obtain employment, he admits difficulty keeping his employment because of his attitude and his mouth getting him in trouble.

17. Father was incarcerated several times during the CHINS. In October of 2014, Father was charged with disorderly conduct but the case was later dismissed. In April of 2015, Father was arrested and charged with Driving While Suspended and those charges remain pending. Father was arrested for failing to appear in court for a previous theft case and spent some time in jail. Father failed to appear for court in the CHINS case as well and was also held in contempt for his behavior in the courtroom.

18. Father was offered services to overcome stability issues but Father participated only sporadically. Father never completed the parenting assessment, mental health assessment, or substance abuse assessment as ordered. No cognitive deficits were identified that would have prevented Father from achieving his goals. Father's biggest barriers to parenting are his choices and lack of planning.

19. Father participated in limited therapy sessions despite accommodations for home-based and telephonic sessions. After Father canceled his August 30, 2015 therapy session, he never contacted the therapist again to reengage in services. Father's anger management issues and difficulty with interpersonal skills were never addressed.

20. Father tested positive for marijuana on December 30, 2014 and April 17, 2015. Father failed to take other drug screens

when requested. One [sic] the first day of the evidentiary hearing, Father testified that he had not used marijuana for two months but failed to submit to a requested drug screen after court. Although Father indicated his alcohol consumption is not a problem, in October of 2014 he appeared in court under the influence of alcohol and behaved belligerently.

22. Although Father was appropriate and prepared for visits, his attendance was inconsistent. Father was discharged from the first visit facilitation agency in October of 2014 due to attendance issues. Father did not visit with [Child] again until April of 2015. Father had one visit in April of 2015 then missed three visits in both May and June. From July until the evidentiary hearing, Father missed three out of twelve visits. Father never progressed beyond fully supervised visits.

23. Services have been available to Father for over fifteen months and he has failed to actively participate in services to effect reunification. Father has demonstrated that he is not stable and will not follow through with services. [Child] needs stability and permanency now.

* * * * *

28. Mother does not believe it would be best for [Child] to be with Father. Prior to the CHINS case, Father did not want contact with [Child] and only showed up periodically. Mother

believed that Father had been drinking or using drugs on many of the occasions that he did see [Child]. Father never provided financial support for [Child] either.

29. The parents were involved in one violent incident during their relationship when Mother broke Father's phone and Father "choke slammed" Mother. The incident ended their relationship. Mother stated Father was also violent to her other children.

30. DCS and CASA believe that termination of parental rights is in the best interests of [Child]. The plan for [Child] is adoption by the foster parents. [Child] is bonded with the foster family and also with his half-sibling that is placed in the same home. [Child] is readily adoptable if the foster family cannot adopt for some reason.

31. CASA observed that [Child] is doing well in his foster home and that he is making great strides in his communication skills. . . . CASA did not observe a bond between Father and [Child].

32. [C]hild needs permanency now. Neither parent has demonstrated the consistency and stability necessary to be the primary caregiver of this [C]hild. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. To continue the parent-child relationship would be detrimental to the [C]hild.

CONCLUSIONS OF LAW

1. There is a reasonable probability the conditions that resulted in removal of the child from the parents' care or the reasons for continued placement outside the home will not be remedied. Mother and Father have yet to demonstrate the ability or

willingness to make lasting changes to obtain and maintain basic stability.

2. Continuation of the parent-child relationships poses a threat to the well-being of the child. The child needs stability in his life. The child need [sic] parents with whom the child can form a permanent and lasting bond and who will provide for the child's emotional, psychological, and physical well-being. The child's well-being would be threatened by keeping the child in parent-child relationships with parents whose own choices and actions have made them unable to meet the needs of this child.

3. DCS has a satisfactory plan of adoption for the care and treatment of the child following termination of parental rights. The child can be adopted and there is reason to believe an appropriate permanent home has or can be found for the child.

4. For the foregoing reasons, it is in the best interests of [Child] that the parental rights of [Father] be terminated.

* * * * *

Court grants Verified Petition to Terminate Parental Rights of [Father].

(Appellant's App. at 26-9.)

# Discussion and Decision

[7] The Fourteenth Amendment to the United States Constitution protects parents' traditional right to "establish a home and raise their children." *In re N.G.*, 51 N.E.3d 1167, 1169 (Ind. 2016). Not only do parents have a fundamental

interest in the upbringing of their children, but "the parent-child relationship is 'one of the most valued relationships in our culture.'" *Neal v. DeKalb Cty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003) (quoting *Tillotson v. Clay Cnty. Dep't of Family & Children*, 777 N.E.2d 741, 745 (Ind. Ct. App. 2002), *trans. denied*). Therefore, when the State seeks to terminate parental rights, a parent's interest in the accuracy of the court's decision is "a commanding one." *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 759 (1982)).

[8] Because of the importance of the interest at issue, the State may not terminate a parent's right to his or her children without proving termination is appropriate by "clear and convincing evidence [which] is a higher burden than establishing a mere preponderance" of the evidence. *Id.* In addition, the State must meet that heightened burden of proof as to a number of allegations:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most

recent twenty-two (22) months, beginning with the date
the child is removed from the home as a result of the child
being alleged to be a child in need of services or a
delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions
that resulted in the child's removal or the reasons for
placement outside the home of the parents will not be
remedied.

(ii) There is a reasonable probability that the continuation
of the parent-child relationship poses a threat to the well-
being of the child.

(iii) The child has, on two (2) separate occasions, been
adjudicated a child in need of services.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of
the child.

Ind. Code § 31-35-2-4(b)(2). The trial court must enter findings of fact to
support each of its conclusions as to those allegations. Ind. Code § 31-35-2-8(c).
If the court finds each of the allegations by clear and convincing evidence then
it must terminate the parent-child relationship. *In re N.G.*, 51 N.E.3d at 1170.

[9] When reviewing a termination of parental rights, we neither reweigh evidence
nor reassess credibility of the witnesses. *In re V.A.*, 51 N.E.3d at 1143. Rather,

we "consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). Because the trial court was to enter findings and conclusions in support of its judgment, we apply a two-tiered standard of review: examining first "whether the evidence clearly and convincingly supports" the trial court's findings and second whether the trial court's "findings clearly and convincingly support" the trial court's conclusions. *Id.* Where, however, the court has entered findings that are not challenged, those findings "must be accepted as correct." *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

## 1. Reasonable Probability Conditions Not Remedied

[10] Father first asserts the trial court's findings of fact are insufficient to support the court's conclusion there was no reasonable probability the conditions that resulted in Child being removed from the home or remaining out of the home would be remedied. We agree with Father.

[11] As Father notes, Child was not living with him when Child was removed from his home and placed into foster care. In fact, when Child was removed from Mother's care and placed in a relative's home, Father's paternity of Child had not yet been established. In such a situation, the conditions resulting in Child being removed from Child's home cannot be attributed to Father. *See In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010). The trial court can, however, consider: (1) what conditions led DCS to keep Child "in foster care rather than placing him

with Father," *id*., and (2) "whether there is a reasonable probability that those conditions will not be remedied." *Id*.

[12] Here, the trial court's findings do not set out the condition or conditions that prohibited DCS from moving Child into Father's custody after Father's paternity was established. Nor, as in *I.A*., were we able to locate such a finding in any of the orders entered by the trial court after establishment of Father's paternity. When those conditions have never been specified, we cannot hold DCS demonstrated by clear and convincing evidence there was a reasonable probability Father would not remedy those conditions. *See id*. at 1135 (termination of a father's rights cannot be sustained on conditions not being remedied when the record was silent as to why child remained in foster care rather than being placed with father). Accordingly, we cannot affirm the termination of Father's parental rights on this basis.

## 2. Continuing Relationship Poses Threat to Well-Being

[13] Father also asserts the court erroneously concluded continuation of his relationship with Child was a threat to Child's well-being. Specifically, the court concluded:

> Continuation of the parent-child relationships poses a threat to the well-being of [C]hild. [Child] needs stability in his life. The [C]hild need [sic] parents with whom the [C]hild can form a permanent and lasting bond and who will provide for the [C]hild's emotional, psychological, and physical well-being. [C]hild's well-being would be threatened by keeping [C]hild in parent-child relationships with parents whose own choices and actions have made them unable to meet the needs of this [C]hild.

(App. at 29.)  Relevant to Father's lack of stability, the court found:

14.  Father is not able to provide a safe and stable home for the child.  Father has failed to demonstrate a reliable, stable means of providing for [C]hild's needs.  Father has failed to make the needs of [C]hild a priority.

15.  Throughout the CHINS case, Father lived on and off with Paternal Grandmother.  Father often stayed with friends and also resided with at least two different girlfriends.  At times, Father lived "in and out of the streets."  Approximately one month prior to the evidentiary hearing, Father and his girlfriend of four months rented an apartment together.  Even though this is the first time Father has obtained housing in his own name, he misrepresented his employment on the rental application.

16.  Father was employed at the beginning of the CHINS case until February of 2015.  Father remained unemployed until August of 2015 when he began working at a bar.  Father was terminated from the bar the first week of September and reports he was fired because a woman thought he was doing something wrong to her.  On the second day of the termination hearing, Father testified he had been employed at Indiana Packers for approximately two weeks.  Although Father has generally been able to obtain employment, he admits difficulty keeping his employment because of his attitude and his mouth getting him in trouble.

17.  Father was incarcerated several times during the CHINS.  In October of 2014, Father was charged with disorderly conduct but the case was later dismissed.  In April of 2015, Father was arrested and charged with Driving While Suspended and those charges remain pending.  Father was arrested for failing to appear in court for a previous theft case and spent some time in

jail. Father failed to appear for court in the CHINS case as well and was also held in contempt for his behavior in the courtroom.

18. Father was offered services to overcome stability issues but Father participated only sporadically. Father never completed the parenting assessment, mental health assessment, or substance abuse assessment as ordered. No cognitive deficits were identified that would have prevented Father from achieving his goals. Father's biggest barriers to parenting are his choices and lack of planning.

(*Id*. at 27.) Father does not challenge the validity of any of those specific findings, and as such, we accept them as correct. *See Madlem*, 592 N.E.2d at 687; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (accepting as true trial court findings that appellant did not challenge).

[14] Father asserts DCS did not prove "Father's alleged failures posed a real threat to [Child]." (Appellant's Br. at 16.) Father notes the evidence that he had not, during his supervised visitation, created threats to Child's physical safety. However, Child's physical safety is not the only concern. *See Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233, 1234 (Ind. 1992) (State need not demonstrate "custody of parents is wholly inadequate for the child's very survival." The State can demonstrate a threat to "emotional and physical development."). Thus, Father must also be in a position to tend to the emotional and physical development of Child, and the court's findings and conclusion indicate the court believed Father's lack of stability, especially with regard to employment and housing, rendered Father a threat to Child's development.

[15]     Although we need not review the evidence that supports each trial court finding, as Father did not challenge any specific finding, we note at least two witnesses testified about why allowing Father to maintain his parental rights would be a threat to Child's well-being.[3] First, DCS caseworker Kristal Banalli-Gramelspacher testified "not terminating the rights it [sic] would be a threat to the [C]hild." (Tr. at 130.) Banalli-Gramelspacher acknowledged that Father interacted appropriately with Child in visitations and that she had no concern Father would hurt Child on purpose; however, she had other concerns:

> The concern at this point is again, [Father] does not participate in any services. There's been no stability. [Child] has been with his mother throughout this whole case; they've already been split up between the sibling groups. He's very connected with his younger brother. There's been interactions with [Father] but its [sic?] four hours a week. There are a lot of hours in that time that he's missed out on that [Father] could have moved towards but he did not . . . . I mean [Father], there's been anger in the past and we don't have anything suggesting that he would hurt the child but he's also not been going to therapy and being in services like he should to help address all those things. The instability with housing; where's [Child] gonna [sic] be in six months if [Father] hasn't you know kept a job and he's gone here and he's gone there and he's all over the place?

---

[3] The inclusion of this testimony in the record distinguishes this appeal from *In re I.A.*, 934 N.E.2d at 1136, in which a DCS case manager testified "[y]es, I do," when asked whether she believed continuing the parent-child relationship was a threat to the child, but did not explain why there was a threat.

(*Id*. at 130-32.)  Second, when the CASA Monica Christopher was asked about whether continuing the parent-child relationship would be a threat to Child, the following exchange occurred:

A Do you mean like – him not coming and like showing up to visits and that would be my –

Q Well, the missed visits have a great negative affect on [Child], is that right?

A Yes, but the inconsistency – I mean if he's never gonna [sic] be there.

Q - (inaudible) – so what kind of stability is [sic] [Father] shown us for his job?

A There hasn't been any stability.

\* \* \* \* \*

Q . . . . How many jobs had [Father] had from September of 2014 until now that you've seen?

A Four to five . . .

\* \* \* \* \*

Q How many different housing situations has [Father] had since September 2014?

A      Aside from the testimony I would say that I only know about one other and that – his mother's house and then the girlfriend that he was living with; that was at the last hearing.

\* \* \* \* \*

Q      Ok.  So it's the failure to have consistent employment, consistent housing, would that lack of stability and [sic] be a threat to [Child]?

A      Of course it would be.

(*Id*. at 171-72.)

[16]      Father also asserts "any threat to the well-being of [Child] could have been reduced or eliminated by providing additional time and services to Father." (Appellant's Br. at 16.)  But there was evidence Father did not take advantage of services that were already offered, and we may not reweigh that evidence.

[17]      DCS worker Banalli-Gramelspacher testified she did not believe Father was going to make Child a priority in the future because

> [Father] hasn't made a priority to his son during this time, I mean making that priority to his son meant participating in those services that meant working through with his therapist on anger management and instability and the past substance abuse, I mean those services were tailored and for him to help him you know, with being able to reunify with his son.  If those weren't important enough to do that and prioritize his son in that aspect how can we assume that . . . he would make his son that priority?

(Tr. at 133-34.)  CASA Christopher testified that although Father can identify what he needs to do to get custody of Child and although Father talks about being committed to getting custody of Child, "he does not follow through with what he says he's gonna [sic] do." (*Id*. at 171.)

[18]   Finally, Father points to the facts that, at the time of the final hearing, he was employed, had adequate housing, was reengaged in services, and was participating in visits with his son.  There was evidence visitation was the only one of many ordered services in which Father was engaged, he had been in his housing with his girlfriend and her children for only a month, and he had been employed for only two weeks at his most recent job, which was his fifth job of the year.  We are not permitted to reweigh the evidence or assess witness credibility.  *In re V.A.*, 51 N.E.3d at 1143.

[19]   While the evidence Father cites could have prompted the trial court to enter findings and conclusions more favorable to Father, we cannot hold the trial court's findings and conclusion clearly erroneous in light of the evidence most favorable to the judgment.  *See, e.g., E.M.*, 4 N.E.3d at 647 ("it was not 'clearly erroneous' for the trial court to find that Father's recent accomplishments, though commendable, were nevertheless outweighed by his historical patterns and ongoing failure to appreciate the extent of his . . . problems").  Nor, in light of the court's unchallenged findings, can we hold the court committed clear

error when it concluded continuation of the parent-child relationship was a threat to Child's well-being.[4]

## 3. Best Interests of Child

[20] Father asserts the court erred in concluding termination of parental rights was in Child's best interests. As we review the trial court's findings and conclusion, we are mindful that deciding whether termination of parental rights is in children's best interests is one of the most difficult determinations to be made in this type of case because it "places the children's interest in preserving the family into conflict with their need for permanency." *In re E.M.*, 4 N.E.3d at 647. Attempting to preserve and reunify families is important not only because preservation implicates parents' fundamental liberty interests, but also because social science research demonstrates children benefit when their parents are involved in their lives. *Id.* Nevertheless, "children also have a paramount need for permanency," *id.*, and courts must keep this in mind so that termination occurs before a "child's physical, mental and social development is permanently impaired." *Id.* at 648. "[C]hildren cannot wait indefinitely for parents to work toward preservation or reunification." *Id.*

---

[4] Because DCS proved this element from Ind. Code § 31-35-2-4(b)(2)(B), we need not reverse based on the trial court's lack of required finding regarding the conditions that prevented Child from being placed with Father. *See supra* part 1. *And see K.E. v. Ind. Dept. of Child Servs.*, 39 N.E.3d 641, 646 n.4 (Ind. 2015) ("Because subsection (b)(2)(B) is written in the disjunctive . . . the trial court need only find one of the two elements by clear and convincing evidence.") (citing *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 373 (Ind. Ct. App. 2006)).

[21] The trial court's conclusion that termination was in Child's best interest is supported by a number of the trial court's findings:

> 23. Services have been available to Father for over fifteen months and he has failed to actively participate in services to effect reunification. Father has demonstrated that he is not stable and will not follow through with services. [Child] needs stability and permanency now.

> \* \* \* \* \*

> 28. Mother does not believe it would be best for [Child] to be with Father. Prior to the CHINS case, Father did not want contact with [Child] and only showed up periodically. Mother believed that Father had been drinking or using drugs on many of the occasions that he did see [Child]. Father never provided financial support for [Child] either.

> \* \* \* \* \*

> 30. DCS and CASA believe that termination of parental rights is in the best interests of [Child]. The plan for [Child] is adoption by the foster parents. [Child] is bonded with the foster family and also with his half-sibling that is placed in the same home. [Child] is readily adoptable if the foster family cannot adopt for some reason.

> 31. CASA observed that [Child] is doing well in his foster home and that he is making great strides in his communication skills. . . . CASA did not observe a bond between Father and [Child].

> 32. [C]hild needs permanency now. Neither parent has demonstrated the consistency and stability necessary to be the primary caregiver of [C]hild. All imaginable services have been

offered and nothing is singularly different in today's circumstances since the time of removal. To continue the parent-child relationship would be detrimental to [C]hild.

(App. at 28-9.)

[22] The record contains evidence that supports the court's findings and conclusion that termination was in Child's best interest. Banalli-Gramelspacher believed termination was in Child's best interest for all the same reasons she had already discussed regarding Father's lack of stability and failure to make Child a priority. CASA Christopher also thought termination of parental rights was in Child's best interest because of Father's instability and lack of consistency. When Mother was asked whether she thought it would be in Child's best interest to continue trying to reunify him with his father, she responded: "No. Because [Child] tells me all the time that his daddy don't [sic] have much to do with him because his daddy don't [sic] even see him all the time. And when that comes out of a kid's mouth it's pretty bad." (Tr. at 66.)

We acknowledge there was evidence in the record that Father loves Child, that Father and Child are bonded, and that Father is "100% committed to taking care of his son." (Appellant's Br. at 18.) But the court was not required to give that testimony the weight that Father would assign it. Furthermore, Father's testimony about his level of commitment lacks credibility when Father did not comply with requests for drug screen sample collections, did not stop using illegal drugs, and did not complete other required assessments and services. We cannot find clear error in the court's findings and conclusion. *See*, *e.g.*, *In re*

*E.M.*, 4 N.E.3d at 649 (holding trial court's decision termination was in children's best interests was not clearly erroneous when "Father's efforts simply came too late").

## 4. Satisfactory Plan for Care of Child

Ind. Code § 31-35-2-4(b)(2)(D) requires a trial court, prior to terminating a parent's right to a child, to conclude DCS has "a satisfactory plan for the care and treatment of the child." It also must enter findings of fact to support that conclusion. Ind. Code § 31-35-2-8(c). We have explained "[t]his plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re L.B.*, 889 N.E.2d 326, 341 (Ind. Ct. App. 2008).

The trial court concluded: "DCS has a satisfactory plan of adoption for the care and treatment of the child following termination of parental rights. The child can be adopted and there is reason to believe an appropriate permanent home has or can be found for the child." (App. at 29.) In support thereof, the trial court found: "The plan for [Child] is adoption by the foster parents. [Child] is bonded with the foster family and also with his half-sibling that is placed in the same home. [Child] is readily adoptable if the foster family cannot adopt for some reason." (*Id.* at 28.)

[25]     Father does not challenge the validity of the trial court's findings or conclusion.[5]  Instead he argues the court should not have found the plan for adoption adequate when his mother, Child's paternal grandmother, was willing and able to have Child placed in her custody.  The record demonstrates DCS had conducted some of the necessary background checks and investigated the possibility of placing Child with his paternal grandmother.  However, when DCS approached paternal grandmother about taking Child, she was unable to do so because she was already caring for her three children and her nephew.  At the final termination hearing, paternal grandmother testified she could take Child, because her nephew had returned to his mother, but that testimony does not invalidate the court's conclusion that DCS's plan of adoption was a satisfactory plan for care of Child.  *See In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (when determining whether DCS had a satisfactory plan for care of a child under Ind. Code § 31-35-2-4(b)(2)(D), DCS plan for adoption of child was not rendered inadequate by father's assertion that his sister would take the child).

# Conclusion

[26]     As the trial court did not enter findings regarding the reasons Child could not be placed in Father's care after paternity was established, we may not affirm

---

[5] We therefore accept those findings and the conclusion as correct.  *See McMaster*, 681 N.E.2d at 747 (accepting as true the trial court findings that appellant did not challenge).

termination based on Father's failure to remedy conditions. However, there is evidence to support the court's remaining findings and conclusions. Accordingly, we affirm the termination of Father's parental rights.

Affirmed.

Kirsch, J., and Crone, J., concur.