# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 16 2016, 8:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Justin R. Wall
Wall Legal Services
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of Ti.C., Tr.C., and Th.C. (Children) and D.C. (Mother) and R.C. (Father);

D.C. (Mother), and
R.C. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

December 16, 2016

Court of Appeals Case No.
85A02-1602-JT-252

Appeal from the Wabash Circuit Court

The Honorable Robert R. McCallen, III, Judge

Trial Court Cause No.
85C01-1403-JT-5
85C01-1403-JT-6
85C01-1403-JT-7

*Appellee-Petitioner.*

**May, Judge.**

[1] D.C. ("Mother") and R.C. ("Father") (collectively, "Parents") appeal the termination of their rights to Ti.C., Tr.C., and Th.C. (collectively, "Children"). Parents assert the trial court denied them due process, their trial counsel was ineffective, and DCS failed to prove their rights should be terminated. In light of the substantiated physical and mental abuse Children experienced in Parents' home and the fear Children expressed about being returned to Parents, we affirm.

## Facts and Procedural History

[2] Ti.C. and Tr.C. were born on May 13, 1998, to Father's sister. Father's sister also gave birth to Th.C. on May 2, 2002. Mother and Father adopted Ti.C. and Tr.C., but they did not complete an adoption of Th.C. Father's sister died before these proceedings arose.

[3] On February 20, 2012, police were called to the home where Parents and Children lived because of a physical altercation between Parents in front of

Children.  Police arrested Mother, and the State charged her with domestic battery, disorderly conduct, and resisting law enforcement.[1]

[4]     When the police arrived at the family's home on the domestic violence call, they found the house and Children to be in such poor condition that they alerted DCS.  DCS visited the family's home and found:

> [It was] cluttered with trash, animal waste, multiple animals, and numerous miscellaneous items.  Both [Family Case Managers] also observed there to be a noticeably strong and pungent odor of animal waste coming from inside the home as soon as the back door of the home was opened[.]
>
> * * * * *
>
> In the kitchen FCM Reynolds observed and documented a pile of laundry with animal feces on top of it laying between kitchen table and the oven, several flies and gnats flying around the kitchen, a pile of dirty dishes lying in the sink, rotting potatoes sitting on a shelving unit, and the kitchen floors appeared to be visibly dirty and soaked with animal urine.
>
> * * * * *
>
> When asked about homeschooling, 9 year-old [Th.C.] reported that he and his siblings have always been homeschooled by their mother and that they do school work for about three to four hours per day.  He also reported that the biggest words he can spell are "poop and cup" and that he does not know how to do

---

[1] Mother later pled guilty to Class A misdemeanor resisting law enforcement.  The State dismissed the other two charges.  The criminal court imposed a sentence and suspended it to probation.

multiplication. All three [Children] informed FCM Reynolds that their mother has told them that they "may be a year or so behind their age-appropriate school grade." [Th.C.] stated that his ankle has been hurting for about a week or so, but that he has to "wait for his card to come before he can go to the doctor." FCM Reynolds observed all three children to be visibly dirty with a strong odor of animal urine at the time that they were removed from their home.

(Appellants' App. Vol. II (hereinafter, "App.") at 81-2.) DCS detained Children that day due to the "deplorable condition of the home." (*Id.* at 82.)

[5] On February 28, 2012, DCS filed petitions alleging Children were children in need of services ("CHINS") based on Mother's domestic battery of Father, the unsanitary conditions of the house, and educational neglect. The court adjudicated Children CHINS on April 27, 2012, and entered dispositional orders that required all members of the family to attend therapy individually and as a group, and provided for supervised visitation. The predispositional report noted:

There have been several issues that have come up with [Mother]. [Mother] has not been compliant with visitation rules and some visits have ended early due to [Mother] discussing inappropriate things with the children. On one occasion [Mother] told the children then would have to take a test, and if they failed it, their Dad would go to jail for a long time. [Mother] also has talked to the children about the court proceedings, and when she is redirected by the visit supervisor she gets very upset. At the Child and Family Team Meeting held on April 11, 2012, the team decided it would be beneficial for [Mother] to have very detailed visitation rules so that she could know what is expected.

> The rules were then presented to [Mother] at the next visit and she refused to sign them.

(*Id*. at 105.) That report also noted Children had begun individual counseling, and each reported to his or her counselor that Parents abused them physically and mentally.

[6] The trial court held a hearing regarding permanency on February 28, 2014. DCS requested the court approve a permanency plan that called for termination of parental rights. When the court entered an order approving termination as the permanency plan, it found:

> 8. [Mother] is not in compliance with the plan as follows: [Mother] is attending her services but hasn't accepted responsibility or acknowledged any problems. Service providers are reporting little progress in achieving the goals set for [Mother].

(*Id*. at 116-7.) DCS filed petitions to terminate the parent-child relationships, and on April 10, 2014, parents filed a *pro se* motion to dismiss the termination proceedings against them. The trial court denied Parents' motion.

[7] On June 4, 2014, DCS moved for modification of the dispositional decree, requesting visitation be permanently suspended and "that the children & parents have no contact." (*Id*. at 123.) DCS alleged:

> a. Service providers are reporting a rapid and continual decline in the children's emotional wellbeing, to-wit:

i. Diane K. Burkhardt, Family Therapy, Huntington Bowen Center

  1. Has observed [Ti.C.] at visits become extremely anxious, very nervous, and angry towards [Parents].

  2. The children appear "very uncomfortable" and "anxious" at the visitations. The daughter, [Tr.C.], curled up into a fetal position during one visit and refused to make eye contact with [Parents].

  3. The children have emotionally and mentally separated themselves from [Parents]. The children are "emotionally shutdown["] from these adults and will not allow themselves to be vulnerable to them again (physically, mentally, or emotionally).

  4. The children have begun having behavioral issues since beginning visitation with [Parents] again.

*  *  *  *  *

ii. Ben Cramer, Individual Counseling, Bowen Center

  1. Recommends that visits be suspended (again) as they've not been productive for a long period of time and are unlikely to improve.

(*Id*. at 123-24.)

[8] On June 6, 2014, the court heard evidence and then suspended visitation and family therapy because:

> [The older two children] do not want to have any contact with
> their parents even in a controlled environment. Such contact
> appears to negatively affect them physically and/or mentally
> because of their past relationship with their parents. Their desire
> is supported by their therapists/counselors and the CASA. The
> Court recognizes it has not yet heard the parents' side of the
> story, however, the children's testimony and demeanor while
> testifying are concerning and the Court is concerned for the
> children's well-being.

(*Id*. at 126.)

Following continuances requested both by DCS and by Parents, the termination hearings occurred over twelve days in 2015. During those hearings, Tr.C. and Ti.C.[2] testified regarding multiple incidents of abuse. Tr.C. testified Mother required her to "tie [Ti.C.] to his bed . . . for six hours maybe" as a form of discipline. (Tr. at 293.) Tr.C. also testified Parents hit her with "[b]elts, like wooden spoons," (*id*. at 290), and withheld food from Children for "[m]aybe like a day," (*id*. at 291), to discipline them. Ti.C. also testified he was "tied to [his] bed. [He] was beat[en] with, uh, belts, and spoons, and [he] was tied to [his] bed a few times." (*Id*. at 250.) Ti.C. testified when Children were denied food as punishment, he "would tie sheets together, go outside [his] bedroom window, and find things in the kitchen. . . .[and then] sneak back into the house." (*Id*. at 253.)

---

[2] Th.C. did not testify during the hearings because the trial court did "not believe his attendance at these proceedings would have been in his best interest. All of the children have suffered enough." (App. at 42.)

Tr.C. testified visiting with Parents made her "stressed" and "worried" during visitation and for "[l]ike a day" before visitation occurred. (*Id.* at 294.) Attending family therapy similarly caused her "anxiety" and "stressed [her] out." (*Id.* at 296.) She did not believe the family made any progress in therapy because Parents "denied everything" Children would say, (*id.*), and called Children "liars." (*Id.* at 295.)

At the time of the hearings in 2015, Parents had not seen Children since June of 2014. Children testified they did not want to return to Parents. Ti.C. testified:

> Q    Do you want to return to live with [Mother] and [Father]?
>
> A    No.
>
> Q    What do you think would happen if you did return to live with [Mother] and [Father]?
>
> A    I don't know. It's a scary thought to think about and I don't want to think about it.
>
> Q    Is it fair to say that –that idea frightens you?
>
> A    Yes.
>
> Q    How do you feel about the CHINS case, um, continuing, kind of hanging over your head?
>
> A    I feel like it's – it's always something so far that I've had to deal with. Like knowing that I'm still dealing with this for three years now.

Q  Does the idea that you might at some point have to go
back to live with [Mother] and [Father] give you any kind
of anxiety?

A  Yeah.  A lot.

Q  If it were up to you to terminate the relationship, to
completely end the relationship between you and [Mother]
and [Father], what would you do?

A  I would end it.

Q  Why?

A  Because they never were good parents to me.  They treated
me terribly.  And I feel as if I was taken away from them it
would be – it would be in my best interest.

(*Id*. at 259-60.)

Tr.C. testified similarly:

Q  How do you feel about [Mother] and [Father]?

A  I feel like they're (inaudible) of what they did and they're
not sorry.

Q  Okay.  Why do you feel that way?

A  Because they keep denying everything . . . .

* * * * *

Q      . . . how does it make you feel that there's the possibility that you might be sent home or sent back to [Mother] and [Father]?

A      It makes me feel really nervous and scared.

Q      Are you frightened of that possibility?

A      Yes.

Q      And what are you afraid might happen if you went back?

A      That the same things would reoccur.

Q      If it were up to you to end your relationship with [Mother] and [Father], would you do it?

A      Yes.

Q      Why?

A      Because they don't deserve us.

Q      Why don't they deserve you?

A      Because of all the stuff they put us through.  Like they don't love us.

(*Id.* at 298, 300.)

[12]     Thereafter, the court terminated Parents' rights in an order that provided the following pertinent findings and conclusions:

> [Children] . . . have never been returned to [Father] and [Mother] and they remain in foster care. Frankly, while a goal from the outset, actually placing [Children] back into their home has never been in [Children's] best interests – for good reasons.
>
> * * * * *
>
> After [Children] began individual counseling, they each reported to their counselors varying degrees of abuse by [Father] and [Mother] of a physical and mental nature. These reports of abuse were substantiated by the DCS and [Children] maintain the allegations are true. The Court finds that physical and mental abuse did occur although perhaps not to the extent portrayed by [Children]. However, physical and/or mental abuse, of any nature and extent, is intolerable.
>
> * * * * *
>
> A series of review, periodic, and permanency hearings have been held since [Children] were adjudicated CHINS. The chronological case summary bares this out. Arguably, with a few exceptions, [Father] and [Mother] have been compliant. However, no appreciable progress has occurred . . . . To address the serious issues in the [ ] family, [Parents] must first accept ownership. They refuse to do that. While they certainly can deny the allegations of abuse, the evidence is overwhelming that it occurred, in varying forms, which caused significant harm to [Children]. The harm is so significant that [Children] want nothing to do with [Father] and [Mother]. The harm is so significant that [Children's] counselors support them in that regard.

Family therapy was occurring for a brief period of time. But similar to [Father] and [Mother's] joint counseling, [Mother's] antics were deemed harmful to [Children]. Diane Burkhardt . . . handled the family therapy. Her clear goal in the family therapy, as directed by the DCS, was reunification. Between [Children] and [Parents], she conducted 15 separate sessions. She met with the children individually then all together. She met with [Father], [Mother], and each child individually, and then all together. The last meeting in June, 2014, was attended only by [Father] and [Mother], as [Children] refused to get out of the car. Some of the meetings were also attended by [Children's] therapists/counselors and one was attended by a [sic] Dr. Boen, who was providing marital counseling to [Father] and [Mother]. However, by the last meeting, it was clear to Ms. Burkhardt that the sessions were counter-productive and harmful to [Children]. She conducted play therapy with [Children] individually and then with [Children] and [Parents] together. Her interpretation of the play therapy with [Children] and her observations of [Children] during family therapy sessions were insightful and on point. [Children] fear [Parents]. [Mother] is the ringleader. [Mother] intimidates them. Their foster home is a place of serenity. [Parents'] home is a place of dysfunction, fear and abuse. [Mother's] actions directly correlate with reports of service providers and Dr. Kupersmith's findings regarding [Father] and [Mother].

Jim Smith, the CASA volunteer, met with [Children] on several occasions and [Father] and [Mother] on a few. . . . His testimony, again consistent with other witnesses called by the DCS, was on point – [Children] have been consistent in their allegations. They fear [Father] and [Mother] and [Parents] are unwilling or unable (the Court believes both) to address their serious parenting deficiencies.

The twins, [Ti.C.] and [Tr.C.], provided emotional testimony about the abuse suffered at the hands of [Father] and [Mother].

[Tr.C.] was shaking and tearful. As most of [Children's] counselors testified, the Court likewise found their testimony to be consistent with their prior statements to the counselors. The Court believes all three children were subjected to varying degrees of physical and mental abuse. However, assuming arguendo that [Children] are making the abuse allegations up, that likewise speaks volumes about the significant erosion and divide in [Parents'] relationship with [Children]. Either way, something is terribly wrong in the [Parents'] household. Clearly, [Children] have reached the point of no return in their relationship with [Father] and [Mother]. Further, while an effort was made to suggest that the revelation that they were adopted was counter-productive and in-fact thwarted attempts at reunification, the damage had been done long before. [Ti.C.] already had suspicions, which he may have shared with [Tr.C.], long before they were detained by the DCS. Further, [Children] had been damaged by the actions of [Father] and [Mother] long before their adoption(s) came to light.

At times during [Father] and [Mother's] emotional testimony, they exhibited glimpses that they recognize something was amiss in their behavior and their relationship with [Children]. However, they still refuse to accept responsibility for the reasons resulting in the removal and/or continued removal of [Children] from their care. The evidence was overwhelming that the home was in a deplorable condition and unfit for human habitation. Their attempts to minimize that by suggesting the issue was simply a result of animal feces in the house was incredulous. To the extent they have learned some valuable lessons, sadly, any lessons learned were not used, at least in their interactions with [Children]. Nothing can be done to salvage the parent-child relationships. [Children] need and deserve permanency.

* * * * *

This case is like many others the Court has presided over. Often what gets the DCS in the parents' door is merely the tip of the iceberg. The conditions in the home and [Children's] educational neglect were the tip of the [Parents'] iceberg. The abuse that had been on-going was titanic.

* * * * *

The evidence is clear and convincing that continuation of the parent-child relationships is not in [Children's] best interests and that doing so would be detrimental to their physical and mental well-being.

DCS made significant efforts to facilitate reunification. Services were offered, time and again. Despite these efforts, neither parent benefitted to any appreciable degree. At no time during the pendency of this action has reunification been considered because of [Parents'] failure to own up to their actions and to make any recognizable or substantive progress. Reunification was the goal, and it was pursued, to no avail.

All of [Children] were diagnosed with Post Traumatic Stress Disorder. However, each have [sic] made progress in either eliminating or reducing the effects of their disorders.

[Children] are thriving in foster care, they are doing well in school and are engaging in social activities, unlike ever before. They want forever homes, other than with [Father] and [Mother].

DCS's plan for [Children] is adoption.

The Court finds, by clear and convincing evidence, that the allegations of the Petitions are true, in that:

a.  [Children] have been removed from their parent's custody for a period of at least six (6) months under dispositional decrees entered in Cause Nos. 85C01-1202-JC-10, 11, & 12;

b.  There is a reasonable probability the conditions that resulted in their removal or their continued removal will never be remedied;

c.  Termination of the parent-child relationship is in their best interests and continuation thereof would be detrimental to their physical and mental well-being; and,

d.  The DCS has a satisfactory plan for their care and treatment. That plan includes adoption and pre-adoptive services.

(App. at 42-9.)

# Discussion and Decision

The Fourteenth Amendment to the United States Constitution protects parents' traditional right to "establish a home and raise their children." *In re N.G.*, 51 N.E.3d 1167, 1169 (Ind. 2016). Not only do parents have a fundamental interest in the upbringing of their children, but "the parent-child relationship is 'one of the most valued relationships in our culture.'" *Neal v. DeKalb Cty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003) (quoting *Tillotson v. Clay Cty. Dep't of Family & Children*, 777 N.E.2d 741, 745 (Ind. Ct. App. 2002), *trans. denied*). Therefore, when the State seeks to terminate parental rights, a parent's

interest in the accuracy of the court's decision is "a commanding one." *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 759 (1982)).

## 1. Trial Court Bias

Parents claim the trial court was biased against them based on comments the trial court made during the proceedings. "In the absence of any evidence to the contrary, we must presume that the trial court judge retained his impartiality and objectivity." *Carter v. Knox Cty. Office of Family and Children*, 761 N.E.2d 431, 436 (Ind. Ct. App. 2001).

> To overcome this presumption, the moving party must establish that the judge has personal prejudice for or against a party. Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before him. Adverse rulings and findings by the trial judge do not constitute bias per se. Instead, prejudice must be shown by the judge's trial conduct; it cannot be inferred from his subjective views.

*Id*. at 435 (internal citations omitted). Additionally, the

> trial court is given latitude to manage the courtroom and maintain order and decorum. "Even where the trial court's remarks display a degree of impatience, if in the context of a particular trial they do not impart an appearance of partiality, they may be permissible to promote an orderly progression of events at trial." However, reversal is required if [a party] shows that the trial judge's actions and demeanor crossed the barrier of impartiality and prejudiced his or her case.

*Marcum v. State*, 725 N.E.2d 852, 856-7 (Ind. 2000) (internal citations omitted), *reh'g denied*.

[15]     Parents did not appear for the termination hearing on May 12, 2015, and their counsel moved to continue the hearing. The trial court denied that motion and stated, "they've been bucking the system the entire time." (Tr. at 392.) Parents appeared for the hearing the next day and moved for mistrial and for substitution of counsel. In response to their motions, the trial court stated:

> I noted on the, uh, docket yesterday that, uh, I did recess [the May 12 hearing] because [Parents] were not here. I had found and satisfied myself, yesterday, [Parents], that you did, in fact have notice of this proceeding. However, because you were not here, I only heard limited testimony of two witnesses yesterday. What I have done and what we're doing now is my court reporter transcribed that testimony and she's going to give you and your wife or you and your husband, however you wish to be referred to, copies of that. [Parents' counsel] also received copies of that and so will the DCS. We're going to conduct hearings today because I will be denying your motion for substitution of counsel because I find that you are continually trying to undermine this proceeding. You are attempting to commit -- Ma'am look, you're rolling your eyes at me and I am sick and tired of your behavior. You have shown disdain for this court throughout these proceedings. You've shown disrespect for everybody that's walked in that that [sic] door other than yourself. Including your husband. I am tired of your behavior. You are doing nothing but trying to interfere with the lawful [sic] of proceedings. I would note, importantly, you previously retained, as you've said, Mr. Freedman at great expense. On January 8th, Mr. Freedman, of 2015, sent me this Motion to Withdraw alleging in that motion and I quote "there has been an irretrievable breakdown in the attorney client relationship."

Those are the words of your former attorney, which tells me that you were very difficult clients for him as well. It's quite obvious from your mannerisms, your behaviors, your antics, your actions, and your conduct that you are doing everything you possibly can to undermine your own attorney believing somehow that will benefit you in these proceedings. Somehow it will delay these proceedings indefinitely. Somehow it will not allow justice to be carried out. I've not ruled on anything as far as whether or not your parental rights will be terminated. I'm ruling on the motions before me right now though. I'm denying your motion for substitution of counsel. I'm denying your motion for a, uh, [sic] declare a mistrial. We're going to go ahead and proceed today. If, after we have concluded these proceedings and you've presented your defenses, you believe you have additional cross examination for the two witnesses that briefly testified yesterday, you weren't here for, I will afford you the opportunity to conduct that. So there has been nothing done that you won't have full opportunity to review, hear, and respond to. Your attorney was here on your behalf because she knew about the hearing and she told you about the hearing. You can shake your head, ma'am, but I'm not buying it. I'm not going to let you do that. That is my responsibility, is to conduct these proceedings, to provide you with due process. You've been afforded due process at every turn. You may not like it. You haven't liked it from the very beginning. I am somewhat sympathetic that these situations typically are these kind of contentious issues. Your children are at stake. The stakes are high. Those children deserve permanency too. You are attempting to undermine that. I am not going to let you do that. I will not be a party to that. I cannot ethically allow that. So denying the motion for substitute counsel. Denying the motion for a mistrial. We will proceed today.

(*Id*. at 420-1.)

[16] On appeal, Parents argue "the trial court's behaviors and statements clearly demonstrate that the trial court had lost its independence and had already determined a course of direction in this matter." (Amended Appellants Br. at 34.) They contend the court's attitude, coupled with the trial court's denial of their motion for substitute counsel and motion for mistrial, denied Parents due process. We cannot agree.

[17] In the statement quoted above, the judge's comments demonstrate frustration with Mother's in-court behavior and with Parents' attempts to delay the proceedings. However, those statements do not demonstrate partiality, as they were coupled with explanations about the safeguards the trial court was providing to insure Parents' due process rights were protected. The judge explicitly informed Parents that no decision had been made about termination of their rights. The court's focus was on maintaining decorum and moving forward with the proceedings so that Children would not remain in limbo.

## 2. Service Provider and DCS Bias

[18] Parents claim DCS and the service providers were biased against them and frustrated the goal of reunification. We cannot agree.

[19] First, as to DCS, Parents claim DCS denied them due process by failing to provide family therapy and supervised visitation. However, those services were provided until the court terminated them because

> [the older two children] do not want to have any contact with
> their parents even in a controlled environment. Such contact

appears to negatively affect them physically and/or mentally because of their past relationship with their parents. Their desire is supported by their therapists/counselors and the CASA. The Court recognizes it has not yet heard the parents' side of the story, however, the children's testimony and demeanor while testifying are concerning and the Court is concerned for the children's well-being.

(App. at 126.) And, as the predispositional report indicates, DCS tried to help Parents modify their behavior to make visitation a more positive experience for Children:

> There have been several issues that have come up with [Mother]. [Mother] has not been compliant with visitation rules and some visits have ended early due to [Mother] discussing inappropriate things with the children. On one occasion [Mother] told the children then would have to take a test, and if they failed it, their Dad would go to jail for a long time. [Mother] also has talked to the children about the court proceedings, and when she is redirected by the visit supervisor she gets very upset. At the Child and Family Team Meeting held on April 11, 2012, the team decided it would be beneficial for [Mother] to have very detailed visitation rules so that she could know what is expected. The rules were then presented to [Mother] at the next visit and she refused to sign them.

(*Id*. at 105.) Parents, and not DCS, are responsible for the termination of family therapy and visitation.

[20] Second, as to service providers, Parents claim Mr. Graham, who was Ti.C.'s individual therapist, "was biased as that was what he previously testified to."

(Amended Appellants' Br. at 36.)  Parents point to a statement made in the proceedings:

> [Parents' Counsel]: You previously testified that you were, perhaps, not the best person to formulate the overall family treatment plan because of your bias towards at least [Ti.C.], is that correct?
>
> [Graham]:    I recognized that that was a potential.  That is.
>
> [Parents' Counsel]: That is what?
>
> [Graham]:    That is why I recommended that Jim Smith be the moderator for the treatment, uh, that was to occur at that time.  So that the family would be well-rec [sic]- or so that I would not in any way bias the methodology in which family counseling occurred.

(Tr. at 180-1.)  On redirect, Graham testified:

> [DCS' Counsel]:    You have answered, uh, in response to one of [Parents' Counsel]'s questions that you had recognized a potential bias in your - that you had towards [Ti.C.] one way or the other.  Were you ever involved in a position that would jeopardize treatment of the family due to that potential bias?
>
> [Graham]:    No.
>
> [DCS' Counsel]:    And, in fact, it would be fair to say that the reason you brought that up was in order to prevent you being placed in a position where you could jeopardize treatment?
>
> [Graham]:    Yes.

(*Id*. at 182.) As that testimony indicates, Graham removed himself as the developer of the family's treatment plan because he feared his sessions with [Ti.C.] would bias the treatment the family would receive. Thus, although Graham was concerned about his bias, Parents cannot demonstrate prejudice from Graham's bias.

Parents also assert Dr. Schonbachler was biased against them because "Mother believed that Dr. Schonbachler was the person responsible for telling Th.C. that he was adopted and threatened Mother that he would drag out the process until Parents lost custody of Children. Mother also believed it was Dr. Schonbachler that told Ti.C. and Tr.C. that they were adopted." (Amended Appellants Br. at 36) (internal citations to the record omitted). To support this assertion, Parents cite only testimony from Mother, whom the trial court was not required to believe.[3] However, Tr.C. testified Parents' adult son, Robbie, confirmed her

---

[3] As for Th.C., the Predispositional Report filed on May 17, 2012, indicates:

> [Th.C] is in Individual Counseling at the Wabash Bowen Center. [Th.C.] is struggling emotionally. [Th.C.] has been told by his siblings that there is a "secret" that he doesn't know and he feels everyone is lying to him. While [Tr.C.] and [Ti.C.] were told by an older sibling that they were adopted, [Th.C.] does not know that. [Th.C.] began to act out due to the emotional stress and was scratching his arms in an attempt to harm himself. A meeting was arranged for [Father] and [Mother] to be able to talk with [Th.C.] and tell him the truth with his counselor and the psychologist present. [Father] and [Mother] would not answer [Th.C.] when he asked if he was adopted, so [Th.C.] is still incredibly troubled by this.

(App. at 99-100.) Thus, *if* Th.C. learned from Dr. Schonbachler he was adopted, the disclosure occurred in that manner only after Parents chose not to discuss the matter with Th.C. when they were given the opportunity to do so in a therapeutic environment.

suspicions she was adopted "like a month before [she] came into foster care." (Tr. at 287.) Parents' arguments are invitations for us to judge the credibility of the witnesses and reweigh evidence, which we cannot do. *See In re N.G.*, 51 N.E.3d at 1170 (appellate court does not reweigh evidence or judge the credibility of witnesses).

[22] Finally, to the extent Parents are asserting bias based on their allegation that Children were alienated from Parents because DCS and service providers revealed the adoption, Parent are simply refusing to acknowledge the evidence in the record that does not support their theory. At the final hearing, when counsel asked Tr.C. whether she wanted to terminate her relationship with Parents because she was adopted, this interaction occurred:

> A   No.
>
> Q   Why is that?
>
> A   Because like all the stuff they did to us.
>
> Q   Okay.
>
> A   It has nothing to do with if we were adopted or not.
>
> Q   Does it have anything to do with anything that anyone from the Department of Child Services has said to you?
>
> A   No.

Q    Does it have anything to do with anything that any of your
     therapists or any other service providers have said to you?

A    No.

(Tr. at 314.) Ti.C. similarly testified he believed Parents' rights should be terminated because "they never were good parents to me. They treated me terribly." (*Id.* at 260.) The record contains substantial evidence that Children were alienated from Parents by years of abuse and neglect, such that Parents' assertions otherwise lack credibility.

## 3.    Conclusions Required by Statute

[23] Because of the importance of the interest at issue, the State may not terminate a parent's right to his or her children without proving termination is appropriate by "clear and convincing evidence [which] is a higher burden than establishing a mere preponderance" of the evidence. *In re V.A.*, 51 N.E.3d at 1144. In addition, the State must meet that heightened burden of proof as to a number of allegations:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The trial court must enter findings of fact to support each of its conclusions as to those allegations. Ind. Code § 31-35-2-8(c). If the court finds each of the allegations by clear and convincing evidence, then it must terminate the parent-child relationship. *In re N.G.*, 51 N.E.3d at 1170.

When reviewing a termination of parental rights, we neither reweigh evidence nor reassess credibility of the witnesses. *In re V.A.*, 51 N.E.3d at 1143. Rather, we "consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). Because the trial court was to enter findings and conclusions in support of its judgment, we apply a two-tiered standard of review: examining first "whether the evidence clearly and convincingly supports" the trial court's findings and second whether the trial court's "findings clearly and convincingly support" the trial court's conclusions. *Id.* Where, however, the court has entered findings that are not challenged, those findings "must be accepted as correct." *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

Parents challenge the trial court's conclusion there is "a reasonable probability the conditions that resulted in their removal or their continued removal will never be remedied."[4] (App. at 49.) Parents assert they "substantially remedied the issues that caused the removal," (Amended Appellants' Br. at 22), because "the 'dirty home' conditions have been remedied, the Children's educational needs were met, and all counseling and educational programs have been resolved." (*Id.*)

---

[4] This is the only one of the statutorily-required conclusions that Parents challenge. Parents concede Children had been removed from their care as required under Indiana Code Section 31-35-2-4(b)(2)(A). (Amended Appellants' Br. at 20.) Parents concede DCS presented witnesses whose testimony established those witnesses believed termination was in the best interests of the Children as required under Indiana Code Section 31-35-2-4(b)(2)(C). (*Id.* at 29.) Parents also concede case law holds a plan of adoption is all DCS needs to satisfy Indiana Code Section 31-35-2-4(b)(2)(D). (*Id.* at 29-30.)

We acknowledge the record contains testimony suggesting Parents had done substantial work on their residence and Children's educational needs were being met by their placement in public schools and tutoring services. We also acknowledge, as did the trial court in its findings: "Arguably, with a few exceptions, [Father] and [Mother] have been compliant [with services]." (App. at 45.)

However, immediately thereafter, the court found:

> [N]o appreciable progress has occurred. [Parents] have accused various service providers of undermining them (again, blaming others) and have sought out services from others not Court ordered. To address the serious issues in the [Parents'] family, they must first accept ownership. They refuse to do that. While they certainly can deny the allegations of abuse, the evidence is overwhelming that it occurred, in varying forms, which caused significant harm to [Children]. The harm is so significant that [Children] want nothing to do with [Father] and [Mother]. The harm is so significant that [Children's] counselors support them in this regard.

(*Id*. at 45-6.) The trial court also specifically found "placing [Children] back into their home has never been in the children's best interests – for good reasons." (*Id*. at 43.) The court explained:

> This case is like many others the Court has presided over. Often what gets the DCS in the parents' door is merely the tip of the iceberg. The conditions in the home and the children's educational neglect were the tip of the [Family's] iceberg. The abuse that had been on-going was titanic.

(*Id*. at 48.)

[28] In their reply brief, Parents argue they are innocent of any abuse allegation and DCS is responsible for "fostering conditions that ultimately contributed to the complete and utter breakdown of the parent-child relationship." (Appellant's Reply Br. at 9.) This argument ignores the facts found by the trial court based on the testimony of Children and others. We cannot reweigh the evidence or reassess the credibility of witnesses. *See In re N.G.*, 51 N.E.3d at 1170 (appellate court does not reweigh evidence or judge the credibility of witnesses).

[29] Parents have not challenged any of the specific findings, and those findings are sufficient to support the court's conclusion there was no reasonable probability the abuse issues that prevented Children from being returned home would ever be remedied.

## 4. Ineffective Assistance of Counsel

[30] Parents also argue the termination of their rights should be reversed because their counsel was ineffective.

> Where parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.

*Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004).

[31] Parents claim counsel was ineffective because she "appeared to be sleeping" during trial, (Amended Appellant's Br. at 38), she "failed generally to communicate about their case and upcoming hearings," (*id.* at 39), failed to get visitation reinstated, failed to obtain necessary documents, failed to subpoena witnesses, "failed to ask many of the questions they wanted asked during trial, failed to enter things into evidence, and failed to properly prepare them and herself for trial." (*Id.* at 40.) Parents also allege counsel was ineffective because she failed to file a motion to dismiss the termination petition when the hearing was not held within the time-frame provided by Indiana Code Section 31-35-2-6. They assert that, had counsel gotten the initial petition dismissed, they would have had "additional time to complete further services, re-implement supervised visitation, family therapy and obtain a forensic psychologist. A new trial would mean that Parents would have more opportunities to demonstrate" they could remedy the reasons the children were removed from their care. (*Id.* at 42-3.)

[32] As DCS notes in its brief, the record does not support all of Parents' allegations about counsel's performance; however, we need not address each of their allegations individually, because our focus is on "whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination." *Baker*, 810 N.E.2d at 1041. As the record leaves us with no

doubt the trial was fundamentally fair and Parents' rights should have been terminated, Parents have not met that standard.

[33] Two of the three children testified at trial about the abuse they endured in Parents' home. Children did not want to visit with, attend family therapy with, or be returned to the custody of Parents. Regardless what additional tactics trial counsel supposedly could have used to further Parents' interests, the simple fact of the matter is that Children want nothing to do with Parents, and trial counsel was not responsible for that reality. Parents cannot demonstrate her assistance was ineffective.

# Conclusion

[34] Parents cannot demonstrate they were prejudiced by the trial court, by service providers, or by counsel because Parents abused Children for years and then called Children liars when they reported the abuse. The findings support the trial court's conclusion that Parents would not correct the circumstances that led to Children's continued removal from Parents' home, and we accordingly affirm.

[35] Affirmed.

Kirsch, J., and Crone, J., concur.